UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
CHARLENE McCLINTON,                 :

                                    :

                 Plaintiff,         :     **REPORT & RECOMMENDATION**

                                    :

    -against-                             13cv8904 (CM)(MHD)

                                    :

CAROLYN W. COLVIN,
Commissioner of Social Security,    :

                 Defendant.         :
------------------------------------x

TO THE HONORABLE COLLEEN McMAHON, U.S.D.J.:


     Plaintiff Charlene McClinton filed this lawsuit pursuant to
section 1614(a)(3)(A) of the Social Security Act, as amended, 42
U.S.C. § 1614(a)(3)(A) ("the Act"), to challenge a final
decision of the Social Security Administration ("SSA") denying
her application for Supplemental Security Income benefits
("SSI") under the Act. Plaintiff and the Commissioner
("defendant") have cross-moved for judgment on the pleadings.


     For the reasons that follow, we recommend that the case be
remanded for development of the record and a new determination
of whether plaintiff is disabled.

1

**BACKGROUND**

## I.  Procedural History

Ms. McClinton[1] filed an application for SSI benefits on August 22, 2008,[2] claiming that she had become disabled on April 22, 2008. (Admin. R. Tr. ("Tr.") 289-90.)[3] Plaintiff based her application on the claim that she suffered from a variety of physical and psychiatric maladies. (Id.).

The SSA denied her application initially on November 3, 2008. (Tr. 139-43). She then requested an evidentiary hearing (see Tr. 151-52), which was conducted on December 3, 2009 before Administrative Law Judge ("ALJ") Cameron Elliot. (Tr. 101-15). In a decision dated December 10, 2009, the ALJ found plaintiff to be not disabled. (Id. at 119-28). The Appeals Council granted Ms. McClinton's request for review of the ALJ's decision on

---

[1] Plaintiff is alternately referred to in the record as Charlene Salters (see, e.g., Tr. 118), Charlene Salters McClinton (see, e.g., id. at 119), and Charlene McClinton. (See, e.g., Complaint).

[2] The parties report the filing date to be August 28, 2008, based on a finding by the ALJ (Def's Mem. 1 (citing Tr. 12));(Pl. Mem 1 (citing Tr. 289-90)), but the record reflects the earlier date that we cite. (Tr. 289-90).

[3] Plaintiff applied at the same time for disability insurance benefits, but that application, which is not at issue here, was denied because she was not covered by disability insurance on or after her claimed disability onset date. (Tr. 287).

March 30, 2011, vacating and remanding the case for further proceedings. (Id. at 132-36). In particular, the Appeals Council required the ALJ to do the following on remand: 1) evaluate plaintiff's obesity in accordance with SSR 02-1p, 2) evaluate plaintiff's mental impairments according to the technique described in 20 C.F.R. § 416.920a, 3) give further consideration to plaintiff's maximum residual capacity during the entire period at issue, and 4) obtain evidence form a vocational expert to clarify the effect of the assessed limitation on her vocational capacity. (Tr. 134).

ALJ Paul A. Heyman held three subsequent hearings, on September 22, 2011, April 5, 2012, and June 6, 2012. (Id. at 12). Ms. McClinton was represented by counsel at each of these hearings. (Id. at 31, 49, 64, 202). On July 13, 2012, the ALJ issued his decision finding Ms. McClinton to be not disabled. (Id. at 12-25). The Appeals Council denied Ms. McClinton's request for review of the ALJ's decision on November 13, 2013, making the Commissioner's determination final. (Id. at 1-5).

## II.   The Pertinent Record

### A. Plaintiff's Submissions and Testimony at the Hearings

#### 1. Submissions

In her initial application, Ms. McClinton indicated that she was born on April 23, 1967. (Tr. 118). As described by the SSA, Ms. McClinton indicated that she suffered from depression, anxiety, dysthymic disorder,[4] spondylosis[5] in her lumbar[6] spine, knee pain, dyspnea[7] on exertion, and an eating disorder. (Id. at 308). She reported that she was unable to climb stairs, bend, crouch, carry, or lift; that it took her about 15-30 minutes to walk two blocks because she continually had to stop; that it took her 15 minutes to stand up after urinating, and that she had trouble sleeping due to the pain. (Id.). Additionally, she reported that the various pain medications that she had taken either had not been effective, or had been effective but caused drowsiness. (Id.).

---

[4] Dysthymia is a less severe form of depression. 6 Attorneys Medical Advisor § 49:15. A diagnosis of dysthymia requires at least 2 symptoms of depression, both of which must be present for at least 2 years. (Id.).

[5] Spondylosis is a bone defect near the root of a vertebra's arch that is often symptomless. 7 Attorneys Medical Advisor § 71:149.

[6] The area of the back that is connected to the hips and legs. 7 Attorneys Medical Advisor § 71:19.

[7] Dyspnea means difficulty breathing. 9 Attorneys Medical Advisor § 90:8.

### 2. Hearing Testimony

At the September 22, 2011 hearing, Ms. McClinton testified that she was married and had three children, ages one, seventeen, and twenty. (Tr. 69, 80). She specified that the one-year old and twenty-year old lived with her, with the older daughter helping her care for the baby. (Id. at 80-81). She testified that her formal education had ended in ninth grade, that she did not have a driver's license, and that she last worked in 2007, at a cosmetics factory, assembling lipstick and lipstick holders. (Id. at 69-70). She said that she left the job after she developed back problems and could not handle the exertion required, for instance, to walk up the steps. (Id. at 70).

### a. Pain Allegations

Ms. McClinton specified that she had pain "in the lower part of [her] back" as well as in both of her knees. (Tr. 76, 86). She testified that her back pain had worsened after she underwent surgeries in the fall of 2010. (Id. at 71-73). During this period, she reported, she had lost approximately 75 pounds, arriving at her current weight of 149 pounds, from her previous weight of 225 pounds in 2010. (Id. at 69, 71-72). She further explained that she had lost the weight because she "was sick . .

. [she] kept getting sick back-to-back. [She] couldn't eat anything." (Id. at 97).

In explaining her back pain, she testified that an MRI showed that there was a lumbar disc bulge that was "twisting." (Id. at 95). As for her knee pain, she explained that doctors had categorized it as arthritis, partially caused by a pre-existing condition of being born with bowed legs. (Id. at 89, 92, 94). She noted that she had had an operation on her knees shortly after she was born but had not had additional knee surgery since then. (Id. at 93). She further explained that her knees were painful, causing "aches in the kneecaps when it like rains or something and [she] catch[es] a lot of cramps and everything in [her] legs." (Id.).

Ms. McClinton testified that she had undergone pelvic-abscess and hernia operations in September, October, and November 2010, at Bronx-Lebanon Hospital Center under the care of Dr. Leburitz.[8] (Id. at 71-73). After the operations, she received follow-up treatment at Bronx-Lebanon Hospital related to the surgeries. (Id. at 71-73). She also testified that, aside

---

[8] This is the phonetic spelling of the doctor's name. The actual name was not sought by the ALJ, nor were we able to find a physician with a name like this in the Bronx-Lebanon Hospital directory.

from the surgeries performed at Bronx-Lebanon, she had been receiving primary care from North General Hospital and Treatment and Diagnostic Center ("North General") since 2006 and was continuing that treatment relationship at the time of the September 2011 hearing. (Id. at 73-74).[9] She identified Dr. Dimitri Alvarez[10] as her current treating physician at North General and the one who prescribed a pain medication and muscle relaxant for her. (Id. at 74-75). She testified that despite the medication she cannot do any activities because she has "excruciating pain." (Id. at 76). She showed the ALJ a back brace she was wearing for lower-back pain and testified that Dr. Winston Lee at the Columbus Rehabilitation Center[11] had been

---

[9] North General closed due to bankruptcy in 2010, but the care and services offered there were replaced within a few months at the same location by the Institute for Family Health. "North General Hospital Is Closing, but Clinics Are Ready to Take Its Place, The New York Times, available at http://nyti.ms/1Du9nrU (last visited Aug. 25, 2015). Ms. McClinton appears to describe this change when she testified that in 2010 "the hospital changed," requiring her to "re-certify and everything back over." (Tr. 84).

[10] Dimitri Alvarez, M.D. is a family practice specialist affiliated with The Institute for Family Health, a clinic that assumed care for the North General patients when that hospital closed in 2010, as well as Beth Israel Medical Center and Mount Sinai Hospital. "Dimitri Alvarez," Health Care for People, http://www.healthcare4ppl.com/physician/new-york/new-york/dimitri-alvarez-1114184637.html (last visited Aug. 25, 2015).

[11] There is one Winston Lee, M.D. registered in New York State, license 220812, with a listing address in Brooklyn, New York. "Verification Services," New York State Office of the Professions,

coordinating her care for her back pain. (Tr. 77-78). Ms. McClinton explained at the hearing that she currently wore a back brace, and had been doing so for the past two weeks. (Id. at 90). She also testified that, twice a week for the past eight weeks, she had been receiving physical therapy for her lower back under Dr. Lee's supervision -- including exercise bikes, massage, and weights -- and that Dr. Lee had prescribed a pain medicine, Naprosyn. (Id. at 76-78, 87-88).[12]  The ALJ also noted during the hearing that Ms. McClinton was currently taking ten milligrams of Cyclobenzaprine[13] and fifteen milligrams of Diclofenac,[14] in addition to the Naprosyn. (Id. at 88).

Ms. McClinton further testified that she had not undergone back or knee surgery to address the pain. (Id. at 86-87).

---

http://www.nysed.gov/coms/op001/opsc2a?profcd=60&plicno=220812&namechk=LEE (last visited Aug. 25, 2015). Columbus Rehabilitation Center is a medical rehabilitation center in Bronx, NY that offers multidisciplinary outpatient care. "About," Columbus Center for Medical Rehabilitation, http://columbusmedicalrehab.com/about.html (last visited Aug. 25, 2015).

[12] Naproxen (or Naprosyn), known by the brand name Aleve, is a non-steroidal anti-inflammatory applied to pain, migraine headache, osteoarthritis, ankylosing spondylitis, rheumatoid arthritis, musculoskeletal, and soft tissue inflammation. 3 Attorneys Medical Deskbook § 40:17.

[13] Cyclobenzaprine is a skeletal muscle relaxant applied to musculoskeletal pain. 3 Attorneys Medical Deskbook § 40:4.

[14] Diclofenac is a phenylacetic acid derivative applied to pain, arthritis, and spondylitis. 3 Attorneys Medical Deskbook § 40:7.

Similarly, she had not received epidural shots or injections since the birth of her youngest daughter.[15] (Id. at 86). Ms. McClinton explained that when she was pregnant, she had stopped taking some of her prescribed medication, but that she was due to restart the medication the following week. (Id. at 85, 87).[16] She testified that she "couldn't go until after the baby turned a year, so they can give me my medication back, so I can get back on my medication." (Id. at 84).

Regarding the severity of her pain and the limitations that it imposed on her, Ms. McClinton stated that she could not stand up, and when she tries, her "body just locks and stiffens and I get a burning sensation. . . . I can't bend at all. I just lay in my bed and I try to play with my baby. I can't even do that." (Tr. 91). Her adult daughter assists with care of the baby. (Id. at 80-81). She testified that the back brace "helps a little. . . . Without it I can't walk or tie my shoe." (Id. at 90). She also noted that taking the subway was not possible for her because it required more standing than she could tolerate. (Id. at 82). She testified that she liked to read newspapers and books, notably novels, as her principal hobby. (Id. at 81).

---

[15] We deduce from the record that Ms. McClinton delivered this child in October 2009. (See, e.g., Tr. 80, 650).

[16] Ms. McClinton had ceased her psychotropic medications during her pregnancy. (Tr. 615, 670, 675).

At the June 6, 2012 hearing, the ALJ asked Ms. McClinton additional questions regarding her pain and her weight loss. Ms. McClinton testified that despite having maintained her significant weight loss for a year at that point, her back pain was worse than before the weight loss. (Tr. 43-44).

### b. Mental Health Issues

Regarding her mental status, Ms. McClinton stated that "[r]ight now I'm depressed from my mom's [death] and I'm still going through it and stuff, so that's why I'm now back and taking [c]are of my business, but I'm still crying." (Tr. 91). She also testified that having a baby had negatively affected her mental state by increasing her depression, though she denied that her care providers had diagnosed her with postpartum depression. (Id. at 83).[17] Instead, she explained that her treating psychiatrist, Dr. Wizenberg,[18] who had been treating her over the two months prior to her September 2011 hearing, had described her symptoms as related to bipolar disorder. (Id. at

[17] Postpartum depression is a severe, long-lasting form of depression triggered by childbirth in some women. "Diseases and Conditions: Postpartum Depression," Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/postpartum-depression/basics/definition/con-20029130 (last visited Aug. 31, 2015).

[18] Also referred to as "Dr. Weisberg" in the hearing transcript. This is the phonetic spelling of an otherwise unidentified doctor. (Tr. 84-85).

84-85).[19] She described a lack of appetite as a symptom of her depression that facilitated dramatic weight loss, explaining that "by my depression, I don't really eat. I don't eat nothing." (Id. at 98). Ms. McClinton also indicated that she avoided taking buses because "the people remind[] me of dead people." (Id. at 82).

Ms. McClinton testified that she had been in group psychotherapy at North General before her pregnancy, although she had not been able to attend due to complications with her pregnancy and depression following the baby's birth, but that she was set to resume it shortly. (Id. at 82-83). At the time of her September 2011 hearing she was receiving individual psychotherapy every other week at North General.[20] (Id. at 79).

Ms. McClinton explained that she had not been in psychiatric treatment for about a year preceding her treatment with Dr. Wizenberg because she had been unable to take the psychotropic medicine or attend group therapy until her baby turned a year old, which would have occurred in late 2010. (Id.

---

[19] Bipolar is a psychiatric disorder that is categorized by swings between manic, energetic behavior and depression. 2 Attorneys Medical Deskbook § 25:24.

[20] The record does not contain treatment notes regarding plaintiff's psychotherapy or psychiatric treatment from this period. Also, we presume that she means the Institute for Family Health. See p. 7, note 9, supra.

at 83-84). She also cited as a factor in the delay a change in the hospital management that also required recertification and other steps to resume treatment. (Id. at 84). Additionally, she explained that her back pain and operations, in conjunction with the fact that she did not have carfare, further prevented her from obtaining treatment. (Id. at 84-85).

Ms. McClinton testified that she would be "getting back in" to group therapy and resuming her psychotropic medicine on the Monday following the hearing. (Id. at 83, 85). She reported that she had previously taken Lexapro,[21] but that it left her with "very bad" stomach pain and that her doctor was planning to prescribe a new medication. (Id. at 80).

In response to ALJ Heyman's question "Do you have any street drug issues?" Ms. McClinton reported that she had graduated from a drug program for cocaine and alcohol in 2006, and that she had not had any relapses since that time. (Tr. 90).

---

[21] Lexapro is a brand name for Escitalopram Oxalate, a selective serotonin reuptake inhibitor ("SSRI"). It is applied to depression, panic disorder, anxiety disorders, obsessive-compulsive disorder, post-traumatic stress disorder, premenstrual dysphoric disorder, and social anxiety disorder. 3 Attorneys Medical Deskbook § 40:15.

## B. Medical Records: Treating Doctors

The record includes several hundred pages documenting outpatient visits to North General Hospital and North General Diagnostic and Treatment Center ("North General") for medical reasons and mental health care between May 13, 2008 and March 17, 2010. (Tr. 467-754, 758-59).[22] Other than a single pain-management referral dated September 20, 2011 (id. at 758), the record does not contain the treatment notes from the successor institution to North General -- the Family Health Center at North General -- even though Ms. McClinton testified that she was receiving treatment from care providers there in 2011 and 2012. (See section II.A.2, supra). The North General team included Dr. Jamal Kobeissi, Dr. Ruth Reid-Thornton, and Dr. Dimitri Alvarez, as well as other doctors and social workers. (Id. at 467-753, 758-59). We note that portions of the record from North General are in handwriting that is partially illegible, making it impossible for us to fully decipher the names of the care providers or the substance of their written notes. (See, e.g., id. at 470-71, 476, 652, 659, 680-682).

---

[22] An internet search revealed that these two entities shared the same address, 1879 Madison Ave, New York, NY, and were thus related institutions. "North General (Closed)," US Hospital Finder; http://www.ushospitalfinder.com/hospital/North-General-Hospital-New-York-NY (last visited Aug. 12, 2015); "North General Diagnostic Treatment Center," HospitalGood.com, http://www.hospitalgood.com/North_General_Diagnostic_Treatment_C enter (last visited Aug. 12, 2015).

### 1. Medical and Physical Ailments and Associated Pain

#### a. North General

Ms. McClinton met with care providers in the women's health, rehabilitation medicine, medicine, neurology, and surgery services at North General to address her back pain, knee pain, fibroid[23] uterus, pelvic pain and abscess, as well as bowel, urination, gynecological, axilla,[24] and breast problems. (Id. at 467-91, 521-62, 619-88, 701-54, 758). The claimant's bowel, urination, gynecological, axilla, and breast problems will not be discussed because plaintiff did not allege them to be severe impairments. (See, e.g., id. at 480; see generally, Plaintiff's Memorandum of Law ("Pl. Mem."), Doc. 9).

In November 2008, January 2009, and March 2009, the treating team at North General Hospital diagnosed Ms. McClinton with a degenerative disk disease in her lumbar spine and noted that the she had high levels of reported lower-back pain, difficulties bending forward, and a decreased ability to walk for prolonged periods of time. (Id. at 521, 662, 673).

---

[23] A common term for benign uterine muscle tumors. 6 Attorneys Medical Advisor § 57:21.

[24] The medical term for "armpit." 5 Attorneys Medical Advisor § 38:21.

The rehabilitation services at North General provided the results of an MRI conducted on June 30, 2008, indicating "mild to moderate bilateral foraminal neural narrowing,"[25] degenerative disc disease, with facet degenerative change "causing flattening of the anterior thecal sac." (Id. at 537.)[26] Dr. Ruth Reid-Thornton[27] of that service entered visit notes on September 24, 2008 and December 3, 2008, as well as a referral for physical therapy dated October 24, 2008. (Id. at 530, 535-37, 686-88).

Ms. McClinton reported to Dr. Reid-Thornton that her non-radiating back pain was six on a ten-point scale on September 24, 2008, that the pain was present when she tried to bend, that

---

[25] Foraminal narrowing describes a condition in which the point where the nerve roots leave the spine -- through herniated or other disc problems -- can become pinched and create both pain and weakness. "Terminology for CT scans and MRI scans," My-Spine.com, http://www.my-spine.com/neck-pain.html (last visited Aug. 25, 2015).

[26] The "anterior thecal sac" is the front of the outer covering of the spinal cord. "Terminology for CT scans and MRI scans," My-Spine.com, http://www.my-spine.com/neck-pain.html (last visited Aug. 25, 2015).

[27] Dr. Ruth Reid-Thornton is a licensed M.D. in New York State, No. 197816, located in Staten Island. "Verification Searches," New York State Office of the Professions, http://www.nysed.gov/coms/op001/opsc2a?profcd=60&plicno=197816&namechk=REI (last visited Aug. 26, 2015). She is listed as a physiatrist board-certified in physical medicine and rehabilitation. "Dr. Ruth A. Reid-Thornton, MD," HealthGrades.com, http://www.healthgrades.com/physician/dr-ruth-reid-thornton-2fk9p/background-check#BackgroundCarePhilosophy_anchor (last visited Aug. 26, 2015).

she was unable to rise from the floor, and that the pain was intermittent, but worsening, which prompted her visit. (<u>Id.</u> at 535). The doctor noted that Ms. McClinton reported crying at night due to pain, and that neither the medication Tramadol[28] nor a muscle relaxant that she had been prescribed were relieving the pain. (<u>Id.</u>). The doctor observed that the patient's gait was normal, but that she had tenderness in her lumbar spine and limited flexion. (<u>Id.</u> at 356). She also noted that plaintiff was taking 10 mg of Lexapro daily. (<u>Id.</u> at 535). An October 24, 2008 note indicates that Dr. Reid-Thornton initiated semiweekly physical therapy for plaintiff to improve her strength and flexibility and reduce her pain. (<u>Id.</u> at 530).

On December 3, 2008 the doctor noted that Naprosyn was providing temporary pain relief and that plaintiff was continuing her Lexapro dosage. (<u>Id.</u> at 686). She indicated that the patient was morbidly obese but not in apparent distress, that she had an antalgic gait and moved slowly, and that she had pain with back flexion. (<u>Id.</u> at 687). Dr. Reid-Thornton prescribed semiweekly physical therapy for another four weeks, discontinued Naprosyn, apparently to be replaced by another

---

[28] Tramadol is a morphine opioid agonist analgesic. It is applied to "moderate to moderately severe pain." 3 Attorneys Medical Deskbook § 40:23.

medication that is not legible to us in the notes, and called for a return visit in one month. (Id. at 688). Dr. Reid-Thornton also provided a physician's note, dated December 3, 2008, indicating that plaintiff had a lumbar-spine disc bulge and facet-joint atrophy, was undergoing semiweekly physical therapy for one-to-two additional months, and should be limited to sedentary work only for the next three months. (Id. at 487).

The record contains entries documenting all eight of the physical therapy appointments -- twice weekly for four weeks -- provided by the rehabilitation medicine team at North General per Dr. Reid-Thornton's October 2008 referral. (Tr. 521-23, 678-79, 683-85). The physical therapy intake form dated October 24, 2008 recounts her history of lower-back pain with difficulty walking and bending forward, and it listed her pain that day as nine on a ten-point scale. (Id. at 528-29). The notes documenting each of plaintiff's eight physical-therapy treatments in November and December 2008 record her reported pain as ranging between six and nine on a ten-point scale. (Id. at 521-23, 678-79, 683-85). She consistently tolerated the exercises well, but her pain tended to increase with prolonged standing or walking. (Id.).

17

A reevaluation form dated January 6, 2009 confirmed that she had been prescribed therapy on October 24, 2008 and treated from November 11, 2008 to December 16, 2008. (Tr. 673). This evaluation reported that she continued to experience the most pain in the morning and at night, and that the therapy provided her only temporary relief. (Id.). Plaintiff's pain at the time of this report was nine on a ten-point scale, and she demonstrated difficulty bending forward, as well as a decreased tolerance for prolonged walking. (Id.). The form set goals to increase her range of motion and strength, and to decrease her pain through continued semiweekly therapy for another four weeks. (Id. at 674).

The rehabilitation medicine service provided a progress report dated January 14, 2009 indicating that Ms. McClinton's pain was the same -- an eight on a ten-point scale. (Tr. 675). This unsigned note documented a mildly antalgic gait, tenderness in the lower back and a decreased range of motion in her back. (Id.). The record also documents two physical therapy treatments, on February 3 and 6, 2009. (Id. at 665-66). These notes do not document plaintiff's reported pain.

With some of the medical records from North General being indecipherable, we are not able to fully surmise the history of

18

Ms. McClinton's medications prescribed by members of the North General treatment team. As best we can understand the record, plaintiff was taking the following medications under North General's supervision. A record dated April 11, 2008 indicates that plaintiff was taking Zoloft[29] for her depression and anxiety (id. at 509); however, in April she was taken off Zoloft due to side effects and put on Lexapro. (Id. at 615). Records document her continued use of Lexapro until her pregnancy in January 2009, and then again after her child was a year old. (See, e.g., Tr. 560, 737). From at least May 13, 2008 to September 24, 2008 plaintiff was taking Simvastatin,[30] presumably to address high cholesterol. (Id. at 458, 475, 479, 535, 547, 557, 560). Prilosec[31] was prescribed between May 2008 and March 2009 to address stomach ailments. (Tr. 479, 532, 557, 560, 662, 686). The doctors at North General prescribed plaintiff Gabapentin[32] to address nerve pain in August 2008; however, a consulting

---

[29] Zoloft is a brand name for Sertraline, a serotonin uptake inhibitor. It is applied to depression, post-traumatic stress disorder, premenstrual dysphoric disorder, and social anxiety disorder. 3 Attorneys Medical Deskbook § 40:29.

[30] Simvastatin, known by its brand name of Simcor, an antilipemic. It is applied to elevated serum cholesterol and triglyceride. 3 Attorneys Medical Deskbook § 40:2.

[31] Prilosec is a brand name for Omeprazole. It is applied to peptic ulcer, esophagitis, and gastroesophageal reflux disease. 3 Attorneys Medical Deskbook § 40:19.

[32] Gabapentin is the generic name for Neurontin and is most commonly used in combination with other drugs to prevent seizures. It is also used to control nerve pain, bipolar disorder, and anxiety. 3 Attorneys Medical Deskbook § 40:17.

physician recorded in October 2008 that she had ceased taking it. (Id. at 370). Around that same time, the records indicate that she was instead taking Naprosyn for pain. (Tr. 370, 500). Ms. McClinton was prescribed Cymbalta by the neurology services in December 2008 through at least June 2009, with the hope that it would control her back pain. (Id. at 615, 675, 682). During the summer of 2009 she took Pepcid as well as prenatal vitamins and iron supplements. (Id. at 623, 653). She was prescribed Keflex[33] at an emergency room visit in August 2009 for a problematic abscess. (Id. at 622-23).

### b. Dr. Winston Lee

In a report dated September 12, 2011, Dr. Lee stated that he had been providing physical therapy for Charlene McClinton at the Columbus Center for Medical Rehabilitation] since July 18, 2011. (Tr. 757). Ms. McClinton's testimony confirms these visits. (Id. at 78, 88). Dr. Lee diagnosed Ms. McClinton, "based on an MRI performed several years ago," with lower back pain

---

[33] Keflex is the brand name for the antibiotic cephalexin. "Keflex," Drugs.com, http://www.drugs.com/keflex.html (last visited Aug. 28, 2015).

from a herniated lumbar intervetebral disc[34] and stated that the pain radiated to both of her legs. (Id. at 757).

On a disability form dated September 26, 2011, Dr. Lee checked "yes" next to the questions of whether the claimant's lifting, standing, walking, sitting, pulling, and pushing were impaired. (Id. at 760-61). Asked whether the claimant could occasionally or frequently lift and/or carry, he found her capable of doing so only for weights of "less than 10 pounds." (Id. at 760). He further found that she could stand or walk only for "less than 2 hours in an 8-hour work day." (Id.). He checked "less than about 6 hours in an 8-hour workday" in response to whether the claimant could sit. (Id. at 761). He also reported that she could balance or kneel only "occasionally." (Id.). He found that she could not climb, crouch, crawl, or stoop. (Id.).

Dr. Lee indicated that plaintiff had "limited" ability to reach in all directions and could do so only "occasionally," but that her ability to handle, finger, feel, see, hear, or speak was not limited. (Id. at 762). He further reported that she had

---

[34] A disorder to the spinal structure that is the most common cause of recurrent or long-term leg and lower back pain. 7 Attorneys Medical Advisor § 71:198.

difficulty ambulating, climbing stairs, and caring for her children. (Id. at 755).

### 2. Mental Health

The record includes treatment notes from February 19, 2008 to September 28, 2009, reflecting that Ms. McClinton received extensive outpatient psychiatry and psychotherapy at North General. (Tr. 492-520, 563-618, 689-700, 759). (See also id. at 737)(letter dated March 17, 2010 from the North General Clinical Director documenting an ongoing treatment relationship since August 30, 2007). We note that plaintiff testified, and her social worker confirmed, that she continued to undergo such treatment in 2011 and 2012; however, the record does not include treatment notes for this period of time, or, for that matter, the period from late 2009 through 2010. (Id. at 40-41, 84-85).

Dr. Jamal Kobeissi[35] completed two evaluative reports for Ms. McClinton, a "Treating Physician's Wellness Plan Report" in

---

[35] Dr. Jamal Hassan Kobeissi is a licensed physician in New York, No. 253706, located in Manhattan. "Verification Services," New York State Office of the Professions, http://www.nysed.gov/coms/op001/opsc2a?profcd=60&plicno=253706&namechk=KOB (last visited Aug. 26, 2015). ProPublica lists a Jamal Kobeissi, MD, practicing in New York, NY and specializing in psychiatry. He completed his residency at North General in 2009. "Jamal Kobeissi, M.D." NetworkTherapy.com,

2008 and a "Medical Source Statement" in 2011, and the records include at least four treatment sessions in 2008 with Dr. Kobeissi. (Tr. 465-66, 509, 517, 563, 567, 763-65). In the June 25, 2008 report, he diagnosed Ms. McClinton with depression and anxiety, with an onset date of August 9, 2007. (Id. at 465). He specified that his assessment was supported by Ms. McClinton's reports of psychotic symptoms when interacting with strangers, and social withdrawal when working with authority, as well as the fact that Ms. McClinton had trouble coping with change, that these environmental pressures increased her symptoms, and that she experienced depressive symptoms as an expression of anxiety in some social situations. (Id.). The doctor described plaintiff as "compliant with treatment," attending scheduled appointments, and taking prescription medicine. (Id. at 466). He noted that she was homeless and unemployed, had a history of substance abuse, and had been sober less than a year at the time of his report. (Id. at 465). He determined that she would be unable to work for six months to a year, explaining that her low energy, sleep challenges, and anxiety would interfere with the demands of a job routine, and that "even minimal" job stress would worsen her symptoms. (Id. at 466). Dr. Kobeissi's 2008 evaluation plainly was informed by both plaintiff's monthly

http://www.networktherapy.com/jamalkobeissi/ (last visited Aug. 26, 2008).

patient visits with him and approximately twenty entries from group and individual therapy appointments between February 2008 and June 2008. (Id. at 492-520, 563-72).

In the October 4, 2011 report, Dr. Kobeissi indicated that Ms. McClinton had "moderate" restrictions in carrying out detailed instructions, making simple work-related decisions, interacting appropriately with the public, and responding appropriately to work pressures or changes in a routine work setting. (Id. at 763-64). He evaluated her as having "slight" restrictions in understanding, carrying out, and remembering simple and short instructions, understanding and remembering detailed instructions, and interacting appropriately with supervisors. (Id.). He also determined that she had no restrictions in interacting appropriately with co-workers. (Id. at 764). Dr. Kobeissi also noted that "Ms. McClinton [] experiences psychotic symptoms (visual hallucinations) when interacting with strangers or people she does not know. Ms. McClinton reports withdrawing socially due to depressive symptoms when working with authority[.] Ms. McClinton has difficulty coping with change and pressure and experiences increase in symptoms when confronted with environmental pressures." (Id.). Additionally, social interactions caused her "manifestations of depressive symptoms that result in expression

of anxiety" and rapid heart rate. (Id.). He further noted that "Ms. McClinton's impairments would be present despite alcohol use and that her mental health diagnosis precedes her use of alcohol." (Id.). Neither the 2011 report nor the record yield any details, such as the number of or dates of any patient visits, reflecting Dr. Kobeissi's treatment of plaintiff between July 2009 and October 2011, when the report was authored.

Psychotherapist Jason Karageorge, while serving as an extern at North General,[36] provided psychotherapy to Ms. McClinton eighteen times, through individual and group sessions, between February 21, 2008 and May 1, 2008. (Tr. 493-508, 510-16). His notes included information about Ms. McClinton's functioning, and the general tenor of his comments was that Ms. McClinton experienced depressive symptoms but typically responded productively to psychotherapy. (Id.). In February and March 2008 he noted that plaintiff experienced increased depressive mood, loss of appetite, insomnia, increased fatigue, and stressors related to homelessness, physical pain, and marital strife. (Id. at 493-505). She described not feeling much

_____

[36] From February 21, 2008 to May 1, 2008 Mr. Karageorge was a psychology extern, treating patients with trauma, addiction, and anger management at North General Hospital. "Training and Experience," Jason P. Karageorge, Ph.D., http://www.jasonkarageorgephd.com/Training---Experience.html (last visited Aug. 28, 2015).

like her true self and expressed great anger over the bureaucratic frustrations that she faced in attempting to solve her homelessness. (Id.). His February 21, 2008 note indicated that Ms. McClinton experienced a single incident of suicidal ideation. (Id. at 493). Her mother's death, combined with her recent sobriety, also challenged her and increased her depression, which led her to sleep and eat more. (Id. at 498).

Mr. Karageorge's early April 2008 notes again document plaintiff's anger and frustration, but also a decrease in her depression when she stopped going to her job-placement assignment. (Id. at 507-08). Her mood demonstrated some improvement throughout April 2008, but the focus of the sessions was on the challenges she faced in her marriage and with maintaining her sobriety. The treatment notes from psychotherapists who met with Ms. McClinton in either individual or group sessions after May 1, 2008 document similar themes, as well as the additional stress of the departure of Mr. Karageorge. (Id. at 518, 520).

The records also include treatment notes from a psychiatrist identified only as Dr. Branch,[37] who met with Ms.

_____

[37] The records do not identify the first name of Dr. Branch and we were not able to confirm a licensed psychiatrist in New

McClinton twenty times between July 7, 2008 and June 8, 2009. (Tr. 566, 568, 570, 574, 576, 581, 583-85, 587-90, 593, 595-96, 599, 605-06, 611). On June 26, 2009, using the DSM axes,[38] Dr. Branch diagnosed Ms. McClinton as follows:

> Axis I: Depressive Disorder NOS (311), Alcohol Dependence in Sustained Full Remission (303.90), Cocaine Dependence in Sustained Full Remission (304.20)
>
> Axis II: Deferred (799.9)
>
> Axis III: Herniated lumbosacral disc(s), Dyslipidemia, Obesity.
>
> Axis IV: Loss of mother, Unemployment, Unstable Housing (couples shelter), unplanned pregnancy.
>
> Axis V: 60[39]

---

York State by that name who may have treated plaintiff at North General.

[38] The DSM-IV is the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition. It is a publication that lists assessment criteria for every mental disorder diagnosis. 1 Attorneys Medical Deskbook § 5:6. "The coding in the manual is used by psychiatrists, clinical psychologists, family therapists, psychiatric nurses, and all other mental health professionals. Health insurers and Medicare require this coding for reimbursement." 2 Attorneys Medical Deskbook § 25:51.10. Psychiatric diagnoses under the DSM-IV are structured along five axes. Axis I is the clinical coding of the specific psychiatric disorder; Axis II is any diagnosis of an underlying personality disorder; Axis III provides diagnosis of medical condition(s) affecting a mental disorder; Axis IV indicates the presence of any psychosocial or environmental problems affecting the care of the disorder; and Axis V is an assessment of overall functioning such as the Global Assessment of Functioning Scale. 2 Attorneys Medical Deskbook § 25:51.10.

[39] This number refers to the Global Assessment of Functioning Scale ("GAF"). Clinicians use GAF to rate a

(Id. at 615-16). In the same entry as this diagnosis, Dr. Branch reported that she was prescribed Zoloft in February 2008, but had changed to 10 mg of Lexapro in April 2008 because the Zoloft did not appear to help and had caused dry mouth. (Id. at 615). Ms. McClinton was later changed to Cymbalta, but stopped taking psychotropic medications early in 2009, presumably because she had become pregnant. (Id.). Ms. McClinton had not "reported or exhibited any symptoms or signs respectively of depression" from going off the psychotropic medications in February 2009 and late June of that year. (Id.).

Dr. Branch noted that her attendance in group was sub-optimal, likely due to "increased social stressors," such as living in a homeless shelter, being separated from her children, and "the obvious grieving for the loss of her therapist," who had left the hospital staff. (Id.). Additionally, Dr. Branch noted that Ms. McClinton did not "100%" comply with her Lexapro medication -- we presume this means other than when she was

---

claimant's ability to function on a scale of 1 to 100. Claimant's score of 60 puts her in in a functional status: above 80 is considered excellent functioning and 40 or below signifies dysfunction typical of hospitalized patents. 2 Attorneys Medical Deskbook § 18:10. A GAF score between 51 and 60 is indicative of "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." DSM-IV-TR 34.

pregnant -- but had found it beneficial in warding off more extreme depressive symptoms. (Id.). She denied having had suicidal ideations except for once in September of 2008, and she attributed that incident to severe back pain. (Id.). Dr. Branch's report concluded that she would continue weekly group therapy, monitor for signs of a relapse into more severe symptoms, and reevaluate medication options after she delivered her baby. (Id. at 616).

Dr. Inderpreet Dhillon[40] met with Ms. McClinton six times between July 6, 2009 and September 28, 2009 in group-therapy sessions. (Tr. 618, 691, 694, 697-99). His records consistently document her mood as euthymic -- that is, non-depressed -- and stable. (Id.). Dr. Dhillon described her as an empathic and self-disclosing member of the group. (Id.).

---

[40] Dr. Inderpreet Dhillon did his residency at North General at the time plaintiff was being treated there. "Inderpreet Dhillon, MD," My Doctor Online, https://mydoctor.kaiserpermanente.org/ncal/provider/inderpreetdh illon/about/professional?ctab=About+Me&to=1 (Last visited Aug. 28, 2015).

On March 17, 2010 Dr. William Carr,[41] identified as the North General clinical director, diagnosed Ms. McClinton as follows:

> Axis I: Depressive Disorder NOS (311), Alcohol Dependence in Sustained Full Remission (303.90), Cocaine Dependence in Sustained Full Remission (304.20)
>
> Axis II: Deferred (799.9)
>
> Axis III: Herniated lumbosacral disc(s), Dyslipidemia, Obesity.
>
> Axis IV: Loss of mother, Unemployment, Housing Issues, New baby, pain.
>
> Axis V: 60

(Tr. 754). In the same entry as this diagnosis, Dr. Carr stated that Ms. McClinton "participates in a psychotherapy group which meets weekly" and "is also seen for medication management." (Id.). There are no treatment records past September 28, 2009.

### 3. Cocaine Addiction

The record demonstrates that Ms. McClinton had graduated from a drug program for cocaine and alcohol in 2006, and that she had not had any relapses. (Tr. 90). Additionally, both Dr.

---

[41] Vitals.com lists a Dr. William M. Carr, practicing in New York, NY, as a psychologist. http://www.vitals.com/doctors/Dr_William_M_Carr_1/profile (last visited June 18, 2015).

Branch and Dr. Carr diagnosed Ms. McClinton with "Cocaine Dependence in Sustained Full Remission (304.20)." (Id. at 616, 754). Consulting examiners Dr. Harding and Dr. Bornstein provided the same diagnosis. (Id. at 367, 395).

The North General records offer conflicting evidence of Ms. McClinton's cocaine use. (Compare id. at 709 and id. at 730). Specifically, while the October 6, 2008 cocaine test was positive, a follow-up urine screening conducted on October 27, 2008 for cocaine was negative. (Id.). A past history of cocaine use is also noted in a patient history from October 27, 2008. (Id. at 706). It appears from the hospital records that Ms. McClinton was scheduled to undergo a hysteroscopy[42] on October 6, 2008, but that the procedure was rescheduled for October 27, 2008 because she had tested positive for cocaine. (Id. at 703-04, 709). The procedure was conducted on October 27, 2008, presumably once her urine test was negative for cocaine or any other drugs. (Id. at 710-30).

---

[42] An examination of the endometrial cavity of the uterus using a fiber optic instrument. 2 Attorneys Medical Deskbook § 17:20.

### C. Medical Records: Consulting Physicians and Non-Physicians

#### 1. Federation Employment & Guidance Service ("FEGS")[43]

In December 2007 and January 2008, the FEGS team prepared a multidisciplinary report on Ms. McClinton regarding her "biopsychosocial" needs relative to vocational rehabilitation. (Tr. 399-462). This report was updated in June 2008, but apparently without any additional testing or examination. (Id. at 456).

Records dated December 31, 2007 and January 22, 2008 indicate that Dr. Uko Okpok,[44] an internist at Bronx-Lebanon Hospital, evaluated Ms. McClinton and documented abnormal musculoskeletal conditions and abnormal mood and affect. (Id. at 409-14, 417-18, 437, 442-47, 457). On December 31, 2007 plaintiff reported no present pain during her examination, but stated that it could rise to nine on a ten-point scale. (Id. at

---

[43] Federation Employment & Guidance Service (FEGS) is a health and human services agency that provides health, disability, and family assistance throughout metropolitan New York. "Who We Are," FEGS, http://www.fegs.org/who-we-are#.VaQKWFJmpCQ (last visited Aug. 11, 2015).

[44] New York State has a listing for Dr. Uko Okpok, No. 227087. "Verification Searches," New York State Office of the Professions, http://www.nysed.gov/coms/op001/opsc2a?profcd=60&plicno=227087&namechk=OKP (last visited Aug. 28, 2015). Dr. Okpok is deceased. See "Akwa Ibom Politics," Blogspot, http://akwaibompolitics.blogspot.com/2011/12/funeral-service-held-for-uko-moses.html (last visited Aug. 28, 2015).

409). Dr. Okpok opined that Ms. McClinton could sit for four to five hours in an eight-hour period, that she had limits in reaching and grasping, that she should limit pulling to one to three hours, and that she should not perform any lifting, kneeling, standing, climbing, walking, or bending. (Id. at 410). An orthopedics examination conducted on January 10, 2008 appears to have provided more extensive evaluations of plaintiff's capacity to exert herself in various ways, but the substance of these entries cannot be discerned from the copy in the record, aside from a typed entry confirming the diagnosis of non-radiating back pain that had worsened with weight gain and identifying limited flexion and extension. (Id. at 419-26).

On January 22, 2008, after various tests and x-rays were taken, Dr. Okpok identified the following conditions affecting her capacity for employment: spondylosis of the lumbar spine, knee pain, dyspnea on exertion and weight gain, dysthymic disorder and generalized anxiety disorder.[45] (Id. at 412). He noted that her complaints of back pain were her most severe impairment, and that her back pain had begun a year earlier and had been worsening, particularly with weight gain. (Id.). The

---

[45] A chronic disorder characterized by high levels of anxiety and lack of a specific focus or cause. 6 Attorneys Medical Advisor § 45:2.

only physical findings were limited flexion and extension and minor degenerative changes revealed on x-rays. (Id.). This evaluation, performed in January 2008, is repeated several times in the FEGS treatment record. (Id. at 413, 437, 447, 457).

The FEGS team's psychiatric evaluation of Ms. McClinton included an extensive social and psychological history revealing depressive symptoms of sleep interruption, appetite disruption, and feelings of helplessness and worthlessness stemming from her mother's death in the summer of 2007, living in a homeless shelter, and a past history of substance abuse. (Id. at 411). On January 7, 2008, Dr. Jorge Kirschtein[46] prepared a psychiatric report on plaintiff (Tr. 427-34), and diagnosed Ms. McClinton as follows:

> Axis I: Dysthymic Disorder (300.4); Generalized
> Anxiety Disorder (300.02); Eating Disorder NOS[47]
> (307.50)
>
> Axis II: Other
> Comments: Axis II: Deferred.
>
> Axis III:
> Comments: Back and Knee Pains, Dyspnea on exertion-
> weight gain; Lipid Profile – Total Cholesterol 252;

---

[46] Dr. Jorge Kirschstein is an attending psychiatrist at Bronx-Lebanon Hospital. "Jorge Kirschstein, M.D.," Bronx-Lebanon Hospital Center, http://www.bronxcare.org/physicians/find-a-physician/detail/jorge-kirschtein/ (last visited Aug. 27, 2015).

[47] "NOS refers to "[n]ot otherwise specified." 1 Attorneys Medical Deskbook § 5:16.

Lipid Profile – LDL 168; CHEM-20 – Glucose 45; CHEM-20
– GGT 58

Axis IV: Educational Problems; Occupational Problems;
Problems with access to health care services

Axis V Current: 40
Axis V Past Year: 65 [48]

(Id. at 431-32).


Supporting the FEGS evaluations are visit entries from social worker Robin Kaynor.[49] On December 31, 2007, Ms. Kaynor conducted an intake evaluation and patient history for Ms. McClinton documenting that for "several days" over the previous two weeks, she felt down, depressed, or hopeless, and that she felt that she had let her family and herself down. (Tr. 404). She also answered "more than half of the days" when asked how often she felt tired and had appetite problems. (Id.). Ms. Kaynor gave plaintiff a PHQ-9 score of 7, which is indicative of mild depression. (Id.).[50] She noted that Ms. McClinton could

---

[48] A GAF score of 40 or less is indicative of severe dysfunction and is usually found in hospitalized patients. 2 Attorneys Medical Deskbook § 18:10. A score of 65 indicates some mild symptoms or difficulty in functioning, but generally a good level of functioning. Id.
[49] Robin Kaynor is a social worker at FEGS. "Robin Kaynor," lead411, https://www.lead411.com/Robin_Kaynor_17461622.html (last visited Aug. 27, 2015).
[50] PHQ-9 refers to the Patient Health Questionnaire, a 9-item questionnaire that is used to measure the degree of depression in elderly patients. Each question addresses whether

travel independently by bus (and had taken the bus to the appointment) but was in pain when she walked long distances. (Id. at 405). Ms. McClinton reported to the social worker that she was able to do household chores, including dishes, cleaning, laundry, and grocery shopping. (Id.).

### 2. Dr. Justin Fernando[51]

On October 8, 2008, Dr. Fernando conducted a consultative orthopedic examination of Ms. McClinton at the request of the SSA. (Tr. 369-74). Relevant to plaintiff's claims, Dr. Fernando diagnosed plaintiff with chronic, non-radiating back pain and obesity, indicating that she had minor limitations for bending and diskogenic disease in her lumbar spine, but no neurological or vascular compromise. (Id. at 372). He recorded plaintiff's

_____

the patient has been bothered by a problem, and can be answered with "not at all" (0 points), "several days" (1 point), "more than half the days" (2 points), or "nearly every day" (3 points). The points are added up, where a total score of 5-9 indicates mild depression, 10-14 indicates moderate depression, 15-19 indicates moderate to severe depression, and 20 or more indicates severe depression. 2 Attorneys Medical Deskbook § 18:10.

[51] Justin Fernando, M.D. is licensed in the State of New York, No. 243090. "Verification Searches," New York State Office of the Professions, http://www.nysed.gov/coms/op001/opsc2a?profcd=60&plicno=243090&namechk=FER (last visited Aug 27, 2015). He specializes in cardio thoracic surgery. "Dr. Justin Fernando, M.D.," HealthGrades.com, http://www.healthgrades.com/physician/dr-justin-fernando-gg8qm (Last visited Aug. 27, 2015).

social and medical history, noting her chief complaint of non-radiating back pain, but no pain in her knees despite undergoing surgery as an infant. (Id. at 239-40). He also noted a gunshot wound from 2000 and her past drug and alcohol dependency. (Id.). Dr. Fernando observed that she did not appear to be in acute distress, walked with a normal gait and needed no help getting on or off the exam table or rising from a chair. (Id. at 371). He documented limited flexion but full extension in her lumbar spine, along with mild tenderness along the lumbosacral spine but normal straight-leg raising results. (Id.).[52] Otherwise, his clinical observations revealed no abnormalities. (Id.). The x-rays he ordered of her right knee and her lumbo-sacral spine were negative. (Id. at 371-74). Dr. Fernando noted that Ms. McClinton reported taking 10 mg of Lexapro and 500 mg of Naproxen, and that she had taken 300 mg of Neurontin,[53] 10 mg of Cyclobenzaprine, and 50 mg of Tramadol in the past. (Id. at 370).

---

[52] Straight-leg raising is an examination to detect if the patient's radicular symptoms are reproduced through stretching the sciatic nerve. The extent to which the leg can be lifted is recorded, where a lift of 70 to 80 degrees without discomfort demonstrates no pathology. 7 Attorneys Medical Advisor § 71:8.

[53] Neurontin is a brand name for Gabapentin. See p. 19 n. 32, supra.

### 3. B. Beavan[54]

On October 29, 2008, based on a medical evidence and file review, B. Beavan concluded that the medical record "partially supported" Ms. McClinton's allegations of pain and incapacity, but ultimately found that Ms. McClinton had the residual functional capacity[55] ("RFC") for "light" work. (Tr. 375-80).[56] Specifically, B. Beavan determined that the evidence supported plaintiff's ability to occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for six hours in an eight-hour day, and push or pull without limitations. (Id. at 376). He found the need for occasional limitations to the non-exertional activities, such as climbing, balancing, stooping, kneeling, crouching, and crawling, because of the

---

[54] The individual who completed this medical file review is not identified sufficiently to confirm his or her identity or whether he or she has a medical degree, much less any specialization.

[55] A residual functional capacity assessment refers to the assessment of one's maximum abilities despite her physical or mental limitations. 20 C.F.R. §§ 416.945(a)(1).

[56] Light work is defined by 20 CFR § 416.967(b). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

decreased range of motion in her lumbar spine. (Id. at 377). He also cited plaintiff's ability to perform the light activities of daily living as further support his RFC assessment. (Id. at 379).

### 4. Dr. Michelle Bornstein[57]

On October 8, 2008 Dr. Bornstein performed a consultative examination at the behest of the SSA and gave a "fair to guarded" prognosis. (Tr. 365-68). Dr. Bornstein diagnosed Ms. McClinton with adjustment disorder[58] with depressed mood and mixed anxiety, as well as cocaine and alcohol dependence in remission. (Id. at 367). She noted back pain as a medically relevant aggravator to her symptoms at Axis III, but did not provide an Axis-IV or Axis-V diagnosis, even though she documented stressors such as living in a homeless shelter and long-term unemployment. (Id. at 365, 368). Dr. Bornstein

---

[57] Michelle D. Bornstein is a licensed but inactive psychologist in New York State, No. 016990. "Verification Searches," New York State Office of the Professions, http://www.nysed.gov/coms/op001/opsc2a?profcd=68&plicno=016990&namechk=BOR (last visited Aug. 27, 2015). She currently practices in Kentucky. "Dr. Michelle Bornstein, Psy.D.," HealthGrades.com, http://www.healthgrades.com/provider/michelle-bornstein-gjm8j#tab=about (last visited Aug. 27, 2015).

[58] Adjustment disorders are characterized by strong reactions to stressful life events. 6 Attorneys Medical Advisor § 45:28. It is considered to be similar to, but less severe than, posttraumatic stress disorder, and can occur in reaction to the death of a loved one. Id.

conducted a mental-status exam and found Ms. McClinton to be dysphoric and dysthymic, but otherwise neatly groomed with a normal gait and behavior, coherent without hallucinations or delusions, and possessing intact concentration and memory skills. (Id. at 366-67). However, the doctor found plaintiff's cognitive functioning to fall in the "low average to borderline range." (Id. at 367). The psychologist opined that plaintiff could follow simple instructions and directions, learn new tasks, maintain concentration and attention, make decisions appropriately, maintain regular schedules, cope with limited amounts of stress appropriately, and adequately relate to others, though, due to her anxiety and depressive symptoms, she might require supervision when performing tasks that are complex. (Id.).

### 5. T. Harding[59]

On October 30, 2008, T. Harding prepared a mental RFC assessment based on a review of the medical evidence in the record. (Tr. 381-97). T. Harding determined that plaintiff was moderately limited in terms of her ability to maintain concentration, interact appropriately with the general public,

---

[59] The individual who completed this medical file review is not identified sufficiently to confirm his or her identity or whether he or she has a medical degree.

accept instruction and respond appropriately to criticism, and respond appropriately to changes in the work setting. (Id. at 395-96). He evaluated the record with regard to each of the regulatory listings for mental illness and found that plaintiff had systems of adjustment disorder that did not precisely satisfy the regulatory criteria. (Id. at 384). He found that plaintiff had moderate limitations in maintaining social functioning and concentration, and a mild limitation in her activities of daily life. (Id. at 391). With regard to the paragraph "C" criteria, T. Harding indicated that no evidence in the record established such a sustained manifestation of mental illness. (Id. at 392).[60]

T. Harding appears to have based this determination on the evidence that plaintiff is able to perform light activities of daily living, can travel independently, and socializes with family and friends. (Id. at 397). He found plaintiff's

---

[60] "Paragraph C" criteria refer to paragraph C of Listings 12.04 and 12.06. Paragraph C requires a medically documented chronic affective disorder of at least 2 years' duration, with at least one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that resulted in such a marginal adjustment that even a minimal increase in mental demands of change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living environment. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04 (C), 12.06(C).

allegations regarding her mental impairments and consequential incapacity to be "partially supported" by the evidence. (Id.).

### D. Vocational Expert Evidence

On two separate occasions the ALJ posed a written interrogatory for Mr. Raymond E. Cestar, a vocational expert, and then also queried Mr. Cestar on these interrogatories at an April 5, 2012 hearing. (Tr. 49-63, 341-45, 351-55). On November 7, 2011, the ALJ provided the following hypothetical, emphasizing an RFC that used the regulatory definition for sedentary work -- but oddly employing the imprecise language "light/sedentary" not found in the regulations -- with additional mental RFC accommodations ("Sedentary Hypothetical"):

> Assume a hypothetical individual who was born on April 23, 1967, has a limited education and is able to communicate in English as defined in 20 CFR 404.1564 and 416.964, and has work experience [of being self-employed from 1995-2001]. Assume further that this individual has the residual functioning capacity (RFC) to perform light/ sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)[61] except simple repetitive

---

[61] 20 CFR § 416.967(a) defines "Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Id.

tasks with no more than occasional contact with
members of public.

Could the individual described [above] perform any of
the claimant's past jobs as actually performed by the
claimant or as normally performed in the national
economy?

***

Could the individual described [above] perform any
unskilled occupations with jobs that exist in the
national economy?

(Id. at 343-44). In response, Mr. Cestar first determined that

Ms. McClinton had been self-employed from 1995 to 2001 (id. at

342), and then replied "no" to whether she could do any of her

past jobs, because he did not know the nature of that self-

employment. (Id. at 343). In answer to the second question, he

listed three occupational titles and corresponding codes from

the Dictionary of Occupational Titles[62] for jobs that existed in

the national economy which an individual described by the

hypothetical could do -- cafeteria attendant, 311.677-010;

bagger, 920.687-018; and cleaner/housekeeper, 323.687-014. (Id.

at 344).

---

[62] The Dictionary of Occupational Titles ("DOT"), last
published by the U.S. Department of Labor in 1991, provides
basic occupational information in the United States Economy. The
SSA, by regulation, relies on the DOT extensively to determine
if jobs exist in the national economy for which a claimant is
qualified, given his or her residual functional capacity. See,
e.g., 20 C.F.R. § 416.966-416.969.

On February 6, 2012, the ALJ provided a second
hypothetical, describing an individual limited to doing light
work, as defined by the regulations,[63] -- but again with the
imprecise language "light/sedentary" not found in the
regulations -- with the accommodation to sit or stand at will
and the same mental RFC from the prior inquiry ("Light
Hypothetical"):

> Assume a hypothetical individual who was born on April
> 23, 1967, has a limited education and is able to
> communicate in English as defined in 20 CFR 404.1564
> and 416.964, and has work experience [of self-
> employment from 1994-2001].[64] Assume further that this
> individual has the residual functioning capacity (RFC)
> to perform light/sedentary work as defined in 20 CFR
> 404.1567(b) and 416.967(b) except option to sit/stand
> at will, simple repetitive tasks with no more than
> occasional contact with members of public.

---

[63] 20 CFR § 416.967(b) defines "Light work. Light work
involves lifting no more than 20 pounds at a time with frequent
lifting or carrying of objects weighing up to 10 pounds. Even
though the weight lifted may be very little, a job is in this
category when it requires a good deal of walking or standing, or
when it involves sitting most of the time with some pushing and
pulling of arm or leg controls. To be considered capable of
performing a full or wide range of light work, you must have the
ability to do substantially all of these activities. If someone
can do light work, we determine that he or she can also do
sedentary work, unless there are additional limiting factors
such as loss of fine dexterity or inability to sit for long
periods of time." Id.

[64] We note that the VE's answer to the Sedentary
Hypothetical was that plaintiff was self-employed from 1995 to
2001, but his response to the Light Hypothetical stated that
plaintiff had been self-employed from 1994 to 2001. (Tr. 343,
353).

>     Could the individual described [above] perform any of
>     the claimant's past jobs as actually performed by the
>     claimant or as normally performed in the national
>     economy?
>
>     ***
>
>     Could the individual described [above] perform any
>     unskilled occupations with jobs that exist in the
>     national economy?

(Id. at 353-54). As before, Mr. Cestar interpreted the information from plaintiff's earnings records to indicate that she had been self-employed, but answered "no" to the first question because he did not know the nature of her prior work. (Id.). In response to the second question, Mr. Cestar replied that there were insufficient jobs in the national economy for a person described by the hypothetical because "the higher level occupations which could be cited . . . do require more than casual contact with the general public. There is only one sedentary level job . . . that permits the elective sit/stand option." (Id. at 354).

On April 5, 2012, in response to objections from plaintiff's counsel, the ALJ called Mr. Cestar to testify regarding his responses to the two previous vocational interrogatories. (Id. at 49-63). Plaintiff's counsel stated that his objections were "on two grounds. One was the hypothetical was inadequate and also that the responses that were given were

improper." (Id. at 51). Under examination, the VE testified that he had deduced plaintiff's prior self-employment from her earnings statements, and that he was not aware of the nature of plaintiff's prior work. (Id. at 53). He agreed with plaintiff's attorney that his determination that she had prior work experience would have been incorrect if her earnings statements merely reflected welfare payments. (Id. at 54). The VE also stated that the file provided to him did not include direct medical evidence, but rather was limited to the hypotheticals provided by the ALJ. (Id. at 54-56). Both the ALJ and the VE stated at the hearing that the VE's job is limited to responding to the hypothetical and does not call for evaluating the direct medical evidence. (Id.). In a heated exchange, the ALJ defended his hypothetical as having been informed by the evidence in the record and stated that his RFC included limitations based on her mental impairments. (Id. at 56-57).

### E. Testimony from Plaintiff's Social Worker

At the June 6, 2012 hearing, Audrey Tinsdale,[65] a social worker from the Sauti Yetu Center for African Women and

---

[65] Ms. Tinsdale is a licensed social worker, LMSW from November 2011. "Verification Searches," New York State Office of Professions, http://www.nysed.gov/coms/op001/opsc2a?profcd=72&plicno=085213&namechk=TIN (last visited Aug. 27, 2015). The Sauti Yetu Center

Families, testified regarding her observations of plaintiff's physical and mental capacities. (Tr. 33-42). As a preventative social worker, Ms. Tinsdale visited Ms. McClinton at her home twice a month beginning in September 2011 and continuing until the time of the hearing on a referral from the Administration for Children's Services regarding plaintiff's teenage son. (Id. at 36, 41). She testified that Ms. McClinton was mostly seated when they met, that she could not walk quickly, and that she walked with a "slight limp." (Id. at 36). Ms. Tinsdale also testified that she observed plaintiff to be "a bit depressed." (Id. at 37). She also heard Ms. McClinton explain that she preferred to be seated, but that even sitting for too long would be painful, and leaving her home to find a job would be a struggle. (Id.). Ms. Tinsdale observed that during her biweekly visits between September 2011 and June 2012 plaintiff consistently moved with demonstrable pain, particularly in her back and her legs. (Id. at 39). She confirmed that Ms. McClinton attends psychotherapy regularly, and that she does a good job tending to her toddler, even though she is unable to pick her up or follow after her. (Id. at 40-41).

---

for African Women and Families provides community-based direct services to African immigrant women and families in New York City. Sauti Yetu Center for African Women and Families, http://www.sautiyetu.org/ (last visited Aug. 27, 2015).

## III.  Standards for SSI Eligibility

An applicant is "disabled" within the meaning of the Act if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). To qualify for benefits, the claimed disability must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 1382c(a)(3)(C); accord Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). In addition to being disabled as defined by the statute, the applicant must also demonstrate that she is financially eligible for benefits. See 42 U.S.C. § 1382(a); Tejada, 167 F.3d at 773 n.2.

The Act requires that the relevant physical or mental impairment be "'of such severity that [plaintiff] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004)(quoting 42 U.S.C. § 423(d)(2)(A)). If the claimant can perform substantial gainful work existing in the national economy, it is immaterial,

for purposes of the Act, that an opening for such work may not be found in the immediate area where she lives or that a specific job vacancy may not exist. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). In assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnosis or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by plaintiff and other witnesses; and (4) the claimant's background, age, and experience." Williams ex rel. Williams, 859 F.2d at 259.

The SSA regulations set forth a five-step sequential process under which an ALJ must evaluate disability claims. 20 C.F.R. § 416.920(a)(4)(i)-(v). The Second Circuit has described this sequential process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the

49

> claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe
> impairment, he has the residual functional capacity to
> perform his past work. Finally, if the claimant is
> unable to perform his past work, the [Commissioner]
> then determines whether there is other work which the
> claimant could perform.

Bush v. Shalala, 94 F.3d 40, 44-45 (2d Cir. 1996)(emphasis in original) (quoting Rivera v. Schweiker, 717 F.2d 719, 722-23 (2d Cir. 1983)).

Plaintiff bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step to demonstrate the existence of jobs in the economy that plaintiff can perform. See, e.g., id. at 45 (quoting same); Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009). At the fourth step, which requires assessing the RFC, if a claimant has more than one impairment, all medically determinable impairments must be considered, including those that are not "severe." 20 C.F.R. § 416.945(a)(2). The assessment must be based on all relevant medical and other evidence, such as physical abilities, mental abilities, and symptomology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 416.945(a)(1)-(3). See also Clarification of Rules Involving Residual Functional Capacity Assessments; Clarification of Use of Vocational Experts

and Other Sources at Step 4 of the Sequential Evaluation
Process; Incorporation of "Special Profile" Into Regulations, 68
Fed. Reg. 51153-01 (Aug. 26, 2003).

Normally, in meeting her burden on the fifth step, the
Commissioner may rely on the Medical-Vocational Guidelines
contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, commonly
referred to as "the Grid[s]."[66] Zorilla v. Chater, 915 F. Supp.
662, 667 (S.D.N.Y. 1996). As the regulations state:

> When the limitations and restrictions imposed by your
> impairment(s) and related symptoms, such as pain,
> affect only your ability to meet the strength demands
> of jobs, . . . and your specific vocational profile is
> listed in a rule contained in appendix 2, we will
> directly apply that rule to decide whether you are
> disabled.[67]

---

[66] "The Grid classifies work into five categories based on
the exertional requirements of the different jobs." Zorilla, 915
F. Supp. at 667 n.2. "Specifically, it divides work into
sedentary, light, medium, heavy, and very heavy, based on the
extent of the requirements in the primary strength activities of
sitting, standing, walking, lifting, carrying, pushing, and
pulling." Id. Based on these factors, the SSA uses the Grids to
evaluate whether the claimant can engage in any other
substantial gainful work that exists in the economy. Id. at 667.

[67] "Limitations are classified as exertional if they affect
your ability to meet the strength demands of jobs. The
classification of a limitation as exertional is related to the
United State Department of Labor's classification of jobs by
various exertional levels (sedentary, light, medium, heavy, and
very heavy) in terms of the strength demands for sitting,
standing, walking, lifting, carrying, pushing, and pulling." All
other limitations are considered non-exertional. 20 C.F.R. §
416.969a(a).

20 C.F.R. § 416.969a(b). However, "'exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations.'" Butts, 388 F.3d at 383 (quoting Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999)). These other limitations -- called non-exertional in the regulations (see 20 C.F.R. § 416.969a) -- include "'limitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling. . . .'" Samuels v. Barnhart, 2003 WL 21108321, *11 n.14 (S.D.N.Y. May 14, 2003) (quoting 20 C.F.R. § 416.969a(a)); see also 20 C.F.R. § 416.969a(c)). Indeed, "[t]he Grids are inapplicable in cases where the claimant exhibits a significant non-exertional impairment (i.e., an impairment not related to strength)." Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) (citing Rosa, 168 F.3d at 82; 20 C.F.R § 404.1569a(c)(2)).

## IV.  The ALJ's Decision

On July 13, 2012, ALJ Heyman rendered a decision finding that plaintiff was not disabled within the definition of the Act. (Tr. 13). The ALJ determined that Ms. McClinton had not

been disabled since her alleged onset date of April 22, 2008. (Id. at 12).

At step one, the ALJ found that the claimant had not engaged in substantial gainful activity after the application date. (Id. at 14). At step two, he determined that Ms. McClinton suffered from a variety of impairments in the form of degenerative disc disease, obesity, a depressive disorder, and substance abuse in remission. (Id. at 14). The ALJ further determined that these impairments were severe due to their combined effect. (Id.).

At step three, the ALJ ruled that the claimant's impairments did not meet the listings in 20 CFR Part 404, Subpart P, Appendix 1. (Id. at 15). He observed that Ms. McClinton's back condition did not meet or equal listing 1.04 because there was no evidence of nerve-root involvement as demonstrated through the negative x-ray, negative MRI, and "mostly normal neurological examinations." (Id.). As for Ms. McClinton's mental impairments, he concluded that they did not meet or equal listing 12.04 because at least two of the "paragraph B" criteria[68] for mental impairments were not met.

---

[68] The "paragraph B" criteria are: (1) marked restriction of activities of daily living; (2) marked difficulties in

(Id.). Specifically, first, as reported by FEGS and Dr. Bornstein, the ALJ found that in "activities of daily living the claimant has no restrictions." (Id.). Second, based on findings by Dr. Bornstein and a consultant's assessment, the ALJ found that in "social functioning, the claimant has moderate difficulties." (Id.). Third, in reliance on Dr. Bornstein, and the state's assessment, the ALJ found that with "regard to concentration, persistence or pace, the claimant has moderate difficulties." (Id. at 15-16). Last, as reported by Dr. Bornstein, the ALJ found that "the claimant has experienced no episodes of decompensation, which have been of extended duration." (Id. at 16). The ALJ also found that "paragraph C" criteria were not present because "there [was] no indication that the claimant ha[d] decompensated," and she had "not been hospitalized or otherwise treated for depression other than as an outpatient and has not required a highly supportive living environment." (Id.).

At step four, the ALJ assessed Ms. McClinton's RFC and found that she could perform light work. (Id.). As for non-exertional limitations, he concluded that Ms. McClinton was

---

maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. (Tr. 18). See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(C).

restricted to "performing simple and repetitive tasks in a job that requires no more than occasional contact with the public" because of a depressive disorder, but was otherwise unrestricted. (Id.).

In addressing the claimant's back pain, the ALJ considered Ms. McClinton's allegations of pain and of restrictions in daily life caused by the pain, and her case worker's opinion that she was significantly limited by the pain. (Id. at 16-17). However, the ALJ concluded that "[d]espite the claimant's allegations, the medical evidence demonstrate[d] that the claimant [was] capable of doing light exertion irrespective of her back pain and obesity." (Id. at 17). Specifically, "there [were] few documented clinical signs in the treatment notes and what [was] there [was] mostly negative," and there were "no other legible positive signs registered in the treatment entry." (Id.).[69]

The ALJ identified North General as plaintiff's "chief treating source," but otherwise observed that "there are few documented clinical signs in the treatment notes and what there is is mostly negative." (Tr. 17). He then recounted a negative straight-leg raising test in June 2008, followed by a positive

_____

[69] The ALJ did not make further comments about how much of the record was illegible and to what extent the illegible records factored into his decision.

one -- "one of the few documented positive clinical signs" -- on July 30, 2008. (Id.). He recognized that complaints of back pain and difficulty walking, standing and bending were documented, and that plaintiff received physical therapy and prescriptions for pain medications. (Id.). He also noted conflicts in the record -- a normal range of motion in March 2009, and a limited range of motion in October 2008 and January 2009. (Id.). He characterized her physical therapy as "brief stints." (Id.). The ALJ also recounted the results of a June 2008 MRI, indicating that it showed bulge and facet degeneration, along with flattening of the anterior thecal sac and mild-to-moderate narrowing of the lateral recesses. (Id. at 18).

The ALJ stated that Dr. Reid-Thornton, one of plaintiff's treating physician from North General, had found that the claimant was "only temporarily and only partly 'disabled' and that she could do sedentary work." (Id. at 18). Additionally, the ALJ observed that although Dr. Lee, the treating physician from Columbus Center for Medical Rehabilitation, had found that the claimant had physical restrictions, "no clinical signs were referenced in the report," other than a "dated" MRI. (Id.).

The ALJ recounted the findings of the January 2008 FEGS medical team's report, which noted "obesity, peripheral edema,

joint swelling, bilateral knee crepitations and a bilateral positive straight[-]leg raising." (Tr. 19). The ALJ discounted the significance of these findings by reasoning that plaintiff was not taking medication, that she reported that the pain only arose when walking long distances, and that "elsewhere in that report, the claimant was found to have no physical findings on examination except for some limited flexion and extension." (Id. at 19).[70]

The ALJ gave significant weight to the assessment of consulting examiner Dr. Fernando. He found Dr. Fernando's opinion to support a finding that plaintiff could undertake light exertion, because the claimant's x-rays were negative, other clinical examinations were negative, and the doctor's examination of the claimant was normal except for mild tenderness of the lumbar spine without paraspinal tenderness and slight limitations in flexion and straight-leg raising. (Id.).

The ALJ cited three principal reasons supporting his determination that Ms. McClinton could do light work. (Tr. 20). First, "the record fail[ed] to document much in the way of positive clinical signs." (Id.). Second, the claimant's

---

[70] As noted in section II.C.1, supra, the FEGS team seems to have evaluated plaintiff and not served as a treating care provider.

"treatment [had] been sporadic at best; she [had] never been emergently treated for back pain and [had] never required surgery." (Id.). Third, other than a "dated MRI" from 2008, Dr. Lee's opinion did not reference any "clinical or objective signs." (Id.). By contrast, Dr. Fernando's opinion was "considerably more realistic in light of the record," and accordingly the ALJ decided to "accord his opinion significant weight." (Id.).

As for plaintiff's obesity, the ALJ found that it "actually has had little to no impact." (Tr. 16-17) In explanation, he stated that she "was not diagnosed with morbid obesity,"[71] she "was independent in her activities of daily living," she was advised to increase her physical activity, there was no indication that her obesity had an effect on her mental status, and she had recently lost a significant amount of weight. (Id.).

The ALJ also concluded that the claimant's fibroid uterus, pelvic pain, and abscess would not have "any adverse effect on her physical ability to work" or "impact [her] ability to do light exertion" because nothing in the record suggested otherwise. (Id. at 19).

_____

[71] Morbid obesity refers to a condition where one is 200% greater than ideal weight or more than 100 pounds over ideal weight. 7 Attorneys Medical Advisor § 64:20

In addressing the claimant's mental impairments, the ALJ concluded that "the claimant's depression [had] been consistently stable and her mental status examinations normal once treatment was underway." (Tr. 20). In this regard, he noted the treating physician's report indicating "an ability to do simple and routine tasks in a job that involves no more than the occasional contact with the public," a report "compatible with the above mental residual functional capacity." (Id. at 20-21). The ALJ also cited the report of Dr. Carr as noting a GAF consistent with "no more than moderate psychiatric limitations." (Id. at 21).

The ALJ declined to accord the June 2008 report of Dr. Kobeissi, one of plaintiff's treating psychiatrist at North General Hospital, much weight because "[i]t is difficult, if not impossible, to reconcile this report with the contemporaneous treatment records, most of which indicated that the claimant's mental status had stabilized and that her mental status examinations were normal." (Id. at 23). However, he gave Dr. Kobeissi's October 2011 report "significant weight" because it was "well supported by the contemporaneous treatment records." (Id. at 21). The 2011 report stated that Ms. McClinton was slightly or moderately restricted in various mental functions, and, according to the ALJ, "an individual with a 'moderate'

59

restriction is still able to function satisfactorily." (Id. at 21).

According to the ALJ, Ms. McClinton's mental health improved with treatment and demonstrated periods of stability. (Id. at 21-22). The ALJ concluded that "there is every indication in the record that the claimant continued to progress despite her lapses of compliance with therapy and medication," as reflected in self-reports and clinical notes in the record ranging from March to September 2009. (Id. at 22).

In addressing the report of Dr. Bornstein, a consultative psychologist, the ALJ determined that "the only positive clinical signs" in the report were "a dysphoric affect and a dysthymic mood and a low average to borderline range of cognitive functioning and a limited general fund of information." (Id.). As for the FEGS report, he described it as indicating, with respect to Ms. McClinton's ability to conduct daily activities, "only moderate restrictions" for some mental capacities, strengths in other mental capacities, and a PHQ-9 score "representing only mild symptoms." (Id. at 22-23). The ALJ appears to have relied on the FEGS team's evaluation of the degree of accommodation needed for plaintiff's mental condition, because he cited it inter alia as a reason why he did not credit

60

Dr. Kobeissi's 2008 report. (Id. at 22-23)(explaining in the paragraph directly following his summary of the FEGA report that "[i]n light of the above reports, I decline to accord the June 2008 report of Dr. Kobeissi, M.D., the claimants treating psychiatrist at North General Hospital, much weight."). The ALJ found that "the claimant would be able to do simple, repetitive tasks in a job that requires no more than occasional contact with the public." (Tr. 23).

At step five of his decision, the ALJ ruled that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 24). In so finding, he recognized that plaintiff was "unable to perform any past relevant work," but deemed her a younger individual under the regulations[72] who had "a limited education," was "able to communicate in English," and had unskilled past relevant work. (Id. at 23).

The ALJ accepted the vocational expert's opinion in response to the ALJ's Sedentary Hypothetical posed on November 7, 2011 (see Tr. 341-45), finding it consistent with the information in the DOT. (Id. at 24). In accepting the VE's

---

[72] Ms. McClinton was born on April 23, 1967 and falls in the younger-individual category, encompassing ages 18-49. See 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00((h)(1).

response to the Sedentary Hypothetical, the ALJ affirmed that this hypothetical incorporated plaintiff's mental RFC. (Id.). At the same time, he gave no weight to the VE's response to the Light Hypothetical, because it incorporated an accommodation to sit and stand at will, which was not part of the final RFC finding. (Id.).

Based on the VE's response to the Sedentary Hypothetical, the ALJ concluded that Ms. McClinton is not disabled under the framework of section 202.17 of the Grid rules, requiring the capacity for light work, and "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Id. at 24).

## V.  This Case

On December 16, 2013, Ms. McClinton filed the present action seeking review of the SSA's decision. She argued that the Commissioner's denial of SSI benefits was not supported by substantial evidence and was wrongly determined. The parties have cross-moved for judgment on the pleadings.

## ANALYSIS

**VI.  The Parties' Motions**

    **A. Plaintiff's Arguments**

In plaintiff's motion for judgment on the pleadings, she asserts seven distinct grounds on which to reverse the Commissioner's determination that she was not disabled:

1) The ALJ failed to comply with the terms of the March 30, 2011 remand order from the Appeals Council to consult with a vocational expert. (Pl. Mem. at 9).

2) The ALJ improperly rejected the claimant's claim of physical impairments caused by her hernia and pelvic conditions. (Id. at 10).

3) The ALJ wrongfully minimized the claimant's mental impairments. (Id.).

4) The ALJ did not consider the pain suffered and described by the claimant in making his RFC determination. (Id.).

5) The ALJ erroneously concluded that there were jobs in the national economy that the claimant could perform. (Id.).

6) The ALJ improperly evaluated the claimant's credibility when he ignored the evidence that supported plaintiff's account and instead relied on minor technical distinctions to support his position. (Id.).

7) The ALJ incorrectly claimed that the "record contains no opinions from treating sources." (Id.).[73]

---

[73] The ALJ recognized that the evidence included treating sources. (See, e.g., Tr. 18, 21, 23).

### B. Defendant's Arguments

Defendant asserts that substantial evidence supports each of the ALJ's findings. (Def. Mem. at 17, 22, 24). Her reply brief specifically rejects plaintiff's claims that the ALJ ignored evidence of her physical and mental impairments. (Def. Reply 2-3). Moreover, defendant asserts that the ALJ properly evaluated plaintiff's credibility and adhered to the regulations in his consideration of the evidence provided by the vocational expert. (Id. at 3-4).

## VII.  Standard of Review

When a plaintiff challenges the Social Security Administration's denial of disability benefits, a court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam))); see 42 U.S.C. § 405(g) (stating that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

"Substantial evidence" is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept

64

as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). The substantial-evidence test applies not only to the Commissioner's factual findings, but also to inferences drawn from the facts. E.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999). In determining whether substantial evidence supports the Commissioner's decision, a reviewing court must consider the whole record, examining the evidence from both sides. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)); Williams ex rel. Williams, 859 F.2d at 258.

The Commissioner, not the court, must resolve evidentiary conflicts and appraise the credibility of witnesses, including the claimant. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983). While the ALJ need not "reconcile every conflicting shred" of evidence, Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [a

65

reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); cf. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (explaining the importance of the reason-giving requirement and holding that plaintiff was entitled to an explanation of why the Commissioner discredited her treating physician's disability opinion).

In addition to the consideration of the evidence in the record, a reviewing court must consider the ALJ's application of the law to the record before him. Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 422 (S.D.N.Y. 2010). The court "reviews de novo whether the correct legal principles were applied and whether the legal conclusions made by the [SSA] were based on those principles." Thomas v. Astrue, 674 F. Supp. 2d 507, 520 (S.D.N.Y. 2009).

Since disability-benefits proceedings are non-adversarial in nature, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel. See Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009); Casino-Ortiz v. Astrue, 2007 WL 2745704, *7 (S.D.N.Y. Sept. 21, 2007) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)). To this end, the ALJ must make

"every reasonable effort" to help an applicant get medical reports from her medical sources. 20 C.F.R. § 416.912(d). Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." Casino-Ortiz, 2007 WL 2745704 at *7 (citing 20 C.F.R. § 416.913(e)(1)–(3)). When there are inconsistencies, ambiguities, or gaps in the record, the regulations lay out several options for the ALJ to collect evidence to resolve these issues, including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others. 20 C.F.R. § 416.920b.[74] The animating principle behind the Commissioner's burden to clarify inconsistencies and ambiguities in the record by seeking additional evidence is "that a hearing

---

[74] On March 26, 2012, the Commissioner eliminated the former regulations at 20 C.F.R. §§ 404.1512(e), 416.912(e), thereby removing the mandate on an ALJ to first contact the treating source to resolve conflicts and ambiguities in the record. How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651 (Feb. 23, 2012)(explaining the new regulations). The new regulation, 20 C.F.R. §§ 404.1520b, 416.920b, "significantly reduce[s]," but does not completely abandon, the need to re-contact a treating source and instead provides an ALJ with several options -- among them contacting the treating source -- to clarify portions of the evidence that are inconsistent or insufficient to allow for a disability determination. Id. See also Gabrielsen v. Colvin, 2015 WL 4597548, *6 (S.D.N.Y. July. 30, 2015)(discussing the implication of the new regulation on the Commissioner's burden to re-contact the treating source). Since the ALJ's decision was issued after the new regulation went into effect, we apply that regulation to our analysis.

on disability benefits is a non-adversarial proceeding." Vazquez v. Comm'r of Soc. Sec., 2015 WL 4562978, *17 n.32 (S.D.N.Y. July 21, 2015)(citing Ureña-Perez v. Astrue, 2009 WL 1726217, *29 (S.D.N.Y. June 18, 2009); Perez, 77 F.3d at 47).

The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so he must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Ferraris, 728 F.2d at 586-87; see also Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, *10 (S.D.N.Y. Aug. 4, 2006) (finding that the ALJ explained his findings with "sufficient specificity" and cited specific reasons for his decision). "'It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions.'" Pacheco v. Barnhart, 2004 WL 1345030, *4 (E.D.N.Y. June 14, 2004) (quoting Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991)). An ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" Kuleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)).

The Act expressly authorizes a court, when reviewing decisions of the SSA, to order further proceedings: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); Butts, 388 F.3d at 382. If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings. Rosa, 168 F.3d at 82-83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117 (2d Cir. 2000)).

## VIII.   Assessment of the Record

We assess the record and conclude that the ALJ's decision suffers from a number of defects that justify a remand for

further development of the record and for findings supported by substantial evidence.

## A. The ALJ Failed to Acquire Complete Evidence.

The ALJ bears the burden of ensuring that the record as a whole is "complete and detailed enough" to support his determinations. 20 C.F.R. § 416.913(e)(1)-(3). This requires him to resolve inconsistencies and ambiguities in the record. Id. § 416.920b. Indeed, an ALJ commits legal error when he rejects a medical assessment without having first sought to develop fully the factual record. See Selian, 708 F.3d at 421 (citing 20 C.F.R. § 404.1520b(c)(1))(holding that in the face of "remarkably vague" evidence from the treating physician, "[a]t a minimum, the ALJ likely should have contacted [the treating physician] and sought clarification of his report."). See also Rosa, 168 F.3d at 80. The ALJ may even be required to develop the claimant's medical history for a period longer than the twelve-month period prior to the date on which the claimant filed if there is reason to believe that such information is necessary to reach a decision. 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 416.912(d). See Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 343 (E.D.N.Y. 2010); see also Pino v. Astrue, 2010 WL 5904110, *18 (S.D.N.Y. Feb. 8, 2010).

70

When the evidence in a claimant's record is inadequate for the SSA to make a determination, the ALJ "will determine the best way to resolve the inconsistency or insufficiency," and the actions taken "will depend on the nature of the inconsistency or insufficiency." 20 C.F.R. § 416.920b(c). In applying this regulation, courts in this Circuit have held that when the information needed pertains to the treating physician's opinion, the ALJ should reach out to that treating source for clarification and additional evidence. Selian, 708 F.3d at 421; Gabrielsen, 2015 WL 4597548 at *6 (holding "that, in some cases, the nature of the record may render re-contacting the treating physician the best, if not the only, way to address gaps or inconsistencies in the record, such that it is incumbent upon the ALJ to do so."); Reynoso v. Colvin, 2015 WL 1378902, *13 (S.D.N.Y. Mar. 26, 2015)(citing Jimenez v. Astrue, 2013 WL 4400533, *11 (S.D.N.Y. Aug. 14, 2013); Cancel v. Colvin, 2015 WL 865479, *4 (S.D.N.Y. Mar. 2, 2015)).

When records produced are illegible but relevant to the plaintiff's claim, a remand is warranted to obtain supplementation and clarification. Pratts, 94 F.3d at 38 (holding that remand was appropriate where the record was missing evidence, and a significant portion of the available evidence was illegible); Cutler v. Weinberger, 516 F.2d 1282,

1285 (2d Cir. 1975)("Where the medical records are crucial to the plaintiff's claim, illegibility of important evidentiary material has been held to warrant a remand for clarification and supplementation."); Chamberlain v. Leavitt, 2009 WL 385401, *8-9 (N.D.N.Y. Feb. 10, 2009)(holding that "sporadic, brief and in some instances, illegible" treatment records justified remand "to fully and fairly develop the record")(citing Cutler, 516 F.2d at 1285). But see Kruppenbacher v. Astrue, 2011 WL 519439, *6 (S.D.N.Y. Feb. 14, 2011)(holding that remand was unnecessary where the illegible record was not material to the claims).

### 1. North General, its Successor Institution, and Specifically Named Doctors

The ALJ failed to mention in his decision two doctors who Ms. McClinton testified were treating her in 2011, Dr. Wizenberg, a doctor to whom Ms. McClinton referred as her "one-on-one psychiatrist" and Dr. Dimitri Alvarez, whom she identified as the treating physician who prescribed her medications. (Tr. 74-75, 84-85; see also section II.A.2, supra). From the context of the record it is clear that these two doctors were part of her care team at North General and/or its successor institution, the Institute for Family Health at North General. (See sections II.B.1.a & II.B.2, supra). And North General was indubitably Ms. McClinton's principal treating

72

source -- the ALJ even referred to North General in his decision as "the claimant's chief treating source." (Tr. 17; sections II.A.2, II.B.1 & II.B.2, supra).

Ms. McClinton testified that Dr. Wizenberg had treated her for the two months preceding her September 2011 hearings; therefore, this doctor's notes should have been subpoenaed to acquire a more complete record of Ms. McClinton's medical history, and his opinion regarding plaintiff's mental impairments should have been obtained. (Id.). For similar reasons, given plaintiff's testimony at the same hearing regarding Dr. Alvarez, the ALJ also should have sought out his treatment notes and opinion. Dr. Alvarez signed an order for pain management referral on September 20, 2011 (Id. at 758), which further highlights the need to have developed the record regarding his treatment of plaintiff.

To satisfy his requirement to make reasonable efforts to ensure that a claimant's medical record is complete, an ALJ may issue a subpoena, enforce a subpoena previously issued, or advise the claimant that she should seek compliance from a physician with a request for records because it is important to her case that the evidence be complete. See, e.g., Almonte v. Apfel, 1998 WL 150996, *7 (S.D.N.Y. 1998); see also Cruz v.

Sullivan, 912 F.2d 8, 12 (2d Cir. 1990) (remanding because ALJ did not advise pro se plaintiff that he could obtain a more detailed statement from his treating physician); Carroll v. Sec'y of Dep't of Health & Human Servs., 872 F. Supp. 1200, 1204-05 (E.D.N.Y. 1995) (remanding where ALJ issued a subpoena to plaintiff's treating physicians, but failed to enforce subpoena or inform plaintiff that she could obtain records independently or call physician to testify). When the ALJ issues a subpoena on his own initiative -- as he must do when "it is reasonably necessary for the full presentation of a claim" -- the regulations place the burden on him to ascertain the correct address. 20 C.F.R. § 405.332(a).[75]

In the record is a subpoena dated September 29, 2011 from ALJ Heyman seeking plaintiff's medical records from "North Central Bronx Hospital" on Kossuth Avenue in Bronx, New York. (Tr. 247-49). This document plainly fails to satisfy the ALJ's burden to make reasonable efforts, as neither the name of the institution nor the address are correct. (See, e.g., id. at 754)(letter on North General Hospital letterhead showing address

---

[75] By contrast, when a subpoena issues at the claimant's request, it is the claimant who has an affirmative duty to file a request that describes "the address or location of the witness or documents with sufficient detail [for the ALJ] to find them." 20 C.F.R. § 405.332(b)(2).

as 1879 Madison Avenue, New York, New York). ALJ Heyman therefore erred with regard to the regulation that places the burden on him to ascertain the correct address when he issues the subpoena on his own initiative. It bears emphasis that although the ALJ has some discretion whether to issue a subpoena, see, e.g., Serrano v. Barnhart, 2005 WL 3018256, *4 (S.D.N.Y. Nov. 10, 2005)(subpoena declined because proposed evidence would be duplicative of evidence already in the record), he cannot ignore essential available medical evidence. This is especially the case here, where there is no medical evidence to document treatments that plaintiff is known to have received after September 2011 and before the ALJ's decision was issued in July of 2012, and scant evidence of treatment between late 2009 and September 2011. See p. 13, supra.

In addition to the ALJ's failure to properly issue and enforce the subpoena to North General Hospital, he also failed to fully develop the record by seeking explanation for the substantial illegible portions of North General records, rather than merely concluding that there were "no other legible positive signs registered in the treatment entry." (Tr. 17).

Considering that North General and its successor institution provided the vast majority of plaintiff's medical

and psychiatric treatment, evidence provided by this treating source is mostly likely material to plaintiff's claims. Therefore, remand is necessary to seek clarification of the illegible portions, the portions for the relevant period not present in the record -- between late 2009 and 2012 -- and, if necessary, available substitutes. Pratts, 94 F.3d at 38; Cutler v. Weinberger, 516 F.2d at 1285 (2d Cir. 1975). The hearing transcripts from September 2011 and June 2012 might be read to show that the ALJ requested updates to the medical record from the plaintiff; in both cases, however, the transcript yields only two disjointed exchanges between plaintiff's counsel and the ALJ at the conclusion of the hearings, and the details regarding what, if anything, was requested are unclear. (Tr. 44-45, 98-99).

Once the evidence from North General is developed fully, the Commissioner should reconsider plaintiff's medical and psychological impairments in light of the complete record.

### 2. Dr. Winston Lee

The record contains a brief letter from Dr. Lee dated September 12, 2011, stating that he treated plaintiff from July 18, 2011 to at least September 12, 2011 (Tr. at 757)("I am currently caring from Charlene McClinton. . . ."), and a report

that he completed for the SSA on her ability to do work-related activities. (Id. at 760-62). Plaintiff confirmed that she was under Dr. Lee's care for physical therapy when she testified at the September 22, 2011 hearing that she had been visiting Dr. Lee twice a week for the past eight weeks. (Id. at 78, 88). Additionally, Dr. Alvarez's September 20, 2011 referral for pain management also indicates that "Columbus" -- presumably Dr. Lee's institution -- would be the care provider for that service. (Id. at 758). This is a further indication of the treatment relationship.

We note that on December 16, 2011, ALJ Heyman apparently subpoenaed all medical records from the Columbus Center for Medical Rehabilitation (Tr. 250-51); however, there are no documents in the record that were responsive to that subpoena and no indication that the ALJ sought to enforce it.[76]

Dr. Lee's opinion, based on his treatment and "an MRI performed several years earlier," was that Ms. McClinton had exertional restrictions consistent with sedentary levels. (Id. at 760-61). A barely legible note in Dr. Lee's Medical Source Statement to the SSA dated September 26, 2011 seems to indicate

_____

[76] The fax date stamp for the records from Dr. Lee shows that that material was sent on September 22, 2011, well before the subpoena seeking full records. (Tr. 762).

that the results of an MRI had been ordered and that Dr. Lee was awaiting that result. (Id. at 761).

The ALJ "decline[d] to accord much weight to Dr. Lee's opinion" because the only objective or clinical sign on which it was bases was an MRI -- presumed by the ALJ to have been taken in 2008 -- and because it was inconsistent with most of the other evidence, and in particular, Dr. Fernando's evaluation from 2008. (Tr. 20). However, we note that Dr. Lee is plaintiff's most recent treating physician with evidence in the record, and a review of his full treatment notes, rather than the cursory letter and summary findings report might reveal recent and material objective evidence of plaintiff's physical impairments. Additionally, Ms. McClinton testified in September 2011 that she had an MRI taken "last year." (Id. at 89). It is at least conceivable that Dr. Lee was relying on a much more recent MRI than the ALJ had assumed. Moreover, Dr. Lee's evidence is consistent with Ms. McClinton's testimony at her September 2011 hearing. (See, e.g. id. at 81-82, 90-91)(stating that she was unable to ride public transportation, that her pain was far greater despite her recent weight loss, and that she was too limited by her physical condition and her pain to care for her child). That plaintiff's back pain may have worsened considerably in 2011 is also supported by her case worker's

78

observations between September 2011 and June 2012 that plaintiff experienced consistent pain that severely limited her mobility. (See discussion section II.E, supra).

Under 20 C.F.R. § 416.920b(b) the ALJ may resolve inconsistencies in the record by weighing the relevant evidence to make a determination. But if the determination cannot be made with the evidence at hand, the ALJ must utilize one of the methods dictated by the regulations to resolve the matter. Id. at § 416.920b(c). Here, the inconsistency is between evidence from 2011 suggesting worsened symptoms and the medical records primarily from 2008 and 2009. In such a situation, the ALJ should have developed the factual record in accordance with 20 C.F.R. § 416.920b(c) to resolve the tension between the evidence from 2011 and the records from the earlier period. See Selian, 708 F.3d at 421. Thus, the Commissioner must develop the record regarding Dr. Lee's treatment, and obtain any comparable evidence that would resolve any inconsistency between the evidence of Ms. McClinton's symptoms in 2011 and the more voluminous evidence from the preceding years.

## B. The Treating Physician Rule May Need to Be Reapplied

The treating-physician rule "requires an ALJ to grant special deference to the opinions of a plaintiff's treating

physician." Acosta v. Barnhart, 2003 WL 1877228, *10 (S.D.N.Y. Apr. 10, 2003). See also Kamerling v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Clark, 143 F.3d at 118; 20 C.F.R. § 416.927(d)(2). The regulations define a "treating source" as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 416.902. The Commissioner "may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s)." Id.

SSA regulations require that the findings of a plaintiff's treating physician be afforded controlling weight when the treating physician's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). Opinion evidence from non-examining sources and non-treating physician examiners typically should not weigh more heavily than that of a treating source. Selian, 708 F.3d at 419 (finding legal error where the ALJ had relied on the opinion of a one-time examiner without

first endeavoring "to reconcile the contradiction or grapple with" an incomplete and ambiguous record from the treating physician); Cruz, 912 F.2d at 13 ("[I]n evaluating a claimant's disability, a consulting physician's opinions or report should be given limited weight."). The treating source's opinion "is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(citing Veino, 312 F.3d at 588; 20 C.F.R. § 416.927(d)(2). "[A]nd the report of a consultative physician may constitute such evidence," Marquez v. Colvin, 2013 WL 5568718, *12 (S.D.N.Y. Oct. 9, 2013)(quoting Mongeur, 722 F.2d at 1039), for instance, when it is by an expert with particularized knowledge. "However, not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008).

If the treating physician's opinion is inconsistent with other substantial evidence in the record, the ALJ is required to apply specific factors to determine the weight that he will give that opinion. 20 C.F.R. § 416.927(c)(2). These factors include the "length of the treatment relationship," the "frequency of

examination[s]," the "nature and extent of the treatment relationship," the degree to which the opinion is supported by "medical signs and laboratory findings," the consistency "with the record as a whole," the specialization of the treating source, and other factors that may be relevant in a given case. 20 C.F.R. § 416.927(c)(2)-(6). See also Halloran, 362 F.3d at 32.

The ALJ must articulate "good reasons" derived from these factors for according less-than-controlling weight to a treating source. Halloran, 362 F.3d at 32-33; Snell, 177 F.3d at 133; 20 C.F.R. § 416.927(c)(2). "Good reasons" refer to "the overwhelmingly compelling type of critique that would permit the Commissioner to overcome an otherwise valid medical opinion." Shaw, 221 F.3d at 135. It is not necessary for the ALJ recite each factor in concluding that good reasons exist, Gabrielsen, 2015 WL 4597548 at *8 (finding that neither the regulations nor the Second Circuit articulates an "explicit-consideration standard" with regard to the factors in the treating-physician rule), but his decision must adequately explain his assessment of the treating doctor's findings.

### 1. Dr. Winston Lee's Evidence May Need to be Reevaluated

As discussed in section VIII.A.2, _supra_, addressing the ALJ's failure to resolve inconsistencies in the record, the ALJ stated that he did not accord much weight to the findings of Dr. Lee, plaintiff's treating physician in 2011, and instead gave "significant weight" to Dr. Fernando, a consulting doctor. (Tr. 20). According to the ALJ, Dr. Lee's opinion did not reference "clinical or objective signs that would support such a restrictive capacity" -- other than a "dated MRI" -- while Dr. Fernando's opinion was "considerably more realistic in light of the record." (_Id._).

Ms. McClinton was Dr. Lee's patient from July 18, 2011 at least to September 12, 2011, and he stated that he was "currently caring for" Ms. McClinton at the Columbus Center for Medical Rehabilitation. (_Id._ at 757). Additionally, Ms. McClinton testified at the September 22, 2011 hearing that she had been visiting Dr. Lee twice a week for the past eight weeks. (_Id._ at 78, 88). This attests to the treatment relationship between Dr. Lee and plaintiff.

We observe that the ALJ extensively reviewed the legible record[77] in arriving at his conclusion that Dr. Lee's opinion was not to be credited. (Tr. 17-18). In particular, he gave controlling weight to the corpus of legible evidence provided by North General, which documented few clinical signs of back impairments and related pain but was overall consistent with a finding that Ms. McClinton was capable of light exertion. (Id.). The ALJ clearly considered the physical therapy conducted in late 2008 and early 2009, clinical exams from the summer of 2009 showing "no tenderness or focal deficits," and the patient's reports of being able to conduct light activities of daily living, including riding public transportation, conducting household chores, and babysitting. (Id. at 17-19). The FEGS report from early 2008 is also consistent with the determination that she could manage light exertion. (Id. at 19). And, as noted above, the ALJ found Dr. Fernando's assessment, supported by contemporaneous x-rays and clinical tests, was consistent with light exertion.

However, given the gaps and inconsistencies in the record -- particularly with regard to the later time period, when Dr.

---

[77] As already discussed in section VII.A.2, supra, the ALJ erred in not seeking to clarify the substantial portions of the North General record that were illegible.

Lee was treating Ms. McClinton -- it may be necessary to reconsider the weight of Dr. Lee's opinion should efforts to complete the record yield new and material evidence regarding plaintiff's physical condition and pain. After all, a consulting opinion -- in this case, of Dr. Fernando -- should not receive greater weight than a treating physician's opinion unless that determination is based on a fully developed record. Selian, 708 F.3d at 419.

## 2. The ALJ Did Not Err in his Evaluation of Dr. Kobeissi's Evidence

Although we leave open the possibility that plaintiff's physical impairments may warrant a different RFC after inconsistencies are resolved, we do not find that ALJ Heyman erred with regard to plaintiff's mental RFC. The ALJ "decline[d] to accord the June 25, 2008 [Treating Physician's Wellness Plan] report of Dr. Kobeissi, M.D., the claimant's treating psychiatrist at North General Hospital, much weight," because he found that report "difficult, if not impossible, to reconcile" with the remainder of the record. (Tr. 23). The ALJ supported his decision with specific citations to the record regarding Ms. McClinton's contemporaneous mental health treatment. For one, this documentation included records of monthly appointments with Dr. Kobeissi, and second, it showed that her "mental status had

stabilized and that her mental status examinations were normal." (Id.)(citing multiple treatment records from 2008 and 2009).

The ALJ's determination that Dr. Kobeissi's June 2008 report should be disregarded was based on a treatment record that included entries from four monthly patient visits with Dr. Kobeissi between April and June 8, 2008 (id. at 509, 517, 563, 567), among no less than twenty treatment entries for individual psychotherapy, group therapy, and psychiatry visits at North General between February and June 2008. (Id. at 492-520, 563-72). With the exception of two visits -- a group therapy summary from March 6, 2008 indicating that plaintiff had an "extreme depressive episode" related to an attempt to return to work (id. at 498) and a group therapy summary from June 6, 2008 noting that her status was "fluctuating" (id. at 564) -- these reports leading up to Dr. Kobeissi's June 25, 2008 evaluation document with consistency a stable mental status with no serious concerns raised regarding her ability to adjust to life and manage her depression through ongoing treatment and medication. The ALJ further noted that although the treatment records from July 7, 2008 through July 6, 2009 demonstrate more sporadic attendance at individual and group-therapy appointments, they also document consistently a stable mental status, self-discipline, and a capacity to adjust to stressful life situations. (Id. at 22,

86

566-618).   One   notable   exception   is   an   indication   of
"fluctuating" status on November 10, 2008, but plaintiff was
struggling with serious physical health issues at that time,
including surgery for a painful pelvic condition in late October
2008. (Id. at 580, 710-30).

Finally, in his October 4, 2011 medical source statement
submitted to the SSA, Dr. Kobeissi indicated that Ms. McClinton
would experience only moderate, slight or no limitations in
various functional capacities as a result of her psychological
symptoms. (Id. at 763-65). Her symptoms at the time included
visual hallucinations and social withdrawal when confronting
strangers, as well as difficulty coping with environmental
pressures. (Id. at 764). Nonetheless, her treating psychiatrist
for several years by that point did not suggest that any of
these symptoms would preclude her entirely from a variety of
work demands. Moreover, Dr. Kobeissi's 2008 note suggested that
Ms. McClinton would need six months to a year of treatment
before she would be capable of returning to work. There is no
indication in the voluminous mental health care records that Ms.
McClinton's condition worsened or remained precarious enough a
year later to justify those earlier concerns.

In light of the significant number of treatment notes provided by the North General mental health team and the general consistency of those notes in portraying an individual who was generally stable and capable of adjusting to daily life with medicine and treatment, we find that the ALJ provided good reasons -- namely, a lack of consistency with the doctor's own treatment notes and those of his treatment team -- for not affording the 2008 opinion of Dr. Kobeissi controlling weight in his determination of plaintiff's mental RFC.

### C. The ALJ Failed to Properly Evaluate Plaintiff's Credibility and Allegations of Pain.

The SSA regulations require the ALJ to assess the claimant's credibility in a systematic way and to take seriously the claimant's report of subjective symptoms. 20 C.F.R. § 416.929. In doing so, the ALJ exercises discretion over the weight assigned to a plaintiff's testimony regarding the severity of her pain and other subjectively perceived conditions, and her resulting limitations. See, e.g., Aronis v. Barnhart, 2003 WL 22953167, *7 (S.D.N.Y. Dec. 15, 2003) (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)); Snell, 177 F.3d at 135. If the ALJ's "'findings are supported by substantial evidence . . . the court must uphold the ALJ's decision to discount the claimant's subjective complaints of

pain.'" Perez v. Barnhart, 234 F. Supp. 2d 336, 340-41 (S.D.N.Y. 2002)(quoting Aponte v. Secretary, Dept. of Health and Human Services, 728 F.2d 588, 591 (2d Cir. 1984)). See also Marcus, 615 F.2d at 27 (citing Richardson, 402 U.S. 389, 401 (1971)).

In assessing the claimant's testimony, the ALJ must take all pertinent evidence into consideration. E.g., Perez, 234 F. Supp. 2d at 340-41; Marcus, 615 F.2d at 27; Jordan v. Barnhart, 29 Fed. App'x 790, 794 (2d Cir. 2002). Even if a plaintiff's account of subjective pain is unaccompanied by positive clinical findings or other objective medical evidence,[78] it may still serve as the basis for establishing disability as long as the impairment has a medically ascertainable source. See, e.g., Harris v. R.R. Ret. Bd., 948 F.2d 123, 128 (2d Cir. 1991) (discussing Gallagher v. Schweiker, 697 F.2d 82, 84-85 (2d Cir. 1983)). The ALJ must consider "all of the available evidence"

---

[78] Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1529(c)(2); see also Casino-Ortiz, 2007 WL 2745704 at *11, n.21 (quoting 20 C.F.R. § 404.1529(c)(2)). Clinical diagnostic techniques include methods showing "residual motion, muscle spasms, sensory deficit or motor disruption." 20 C.F.R. § 416.929(c)(2). See also 20 C.F.R. § 416.928(b). Laboratory findings "are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." 20 C.F.R. § 416.928(c).

concerning a plaintiff's complaints of pain when they are accompanied by "medical signs and laboratory findings . . . which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . , would lead to a conclusion that you are disabled." 20 C.F.R. § 416.929(a).

The ALJ must apply a two-step process to evaluate a plaintiff's subjective description of his or her impairment and related symptoms. SSR 96-7p (summarizing framework). "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) -- i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques -- that could reasonably be expected to produce the individual's pain or other symptoms." Id. See also Martinez, 2009 WL 2168732 at *16; 20 C.F.R. § 416.929(c)(1).

> Second, once an underlying physical or mental
> impairment(s) that could reasonably be expected to
> produce the individual's pain or other symptoms has
> been shown, the adjudicator must evaluate the
> intensity, persistence, and limiting effects of the
> individual's symptoms to determine the extent to which
> the symptoms limit the individual's ability to do
> basic work activities. For this purpose, whenever the
> individual's statements about the intensity,
> persistence, or functionally limiting effects of pain
> or other symptoms are not substantiated by objective
> medical evidence, the adjudicator must make a finding

> on the credibility of the individual's statements
> based on a consideration of the entire case record.
> This includes the medical signs and laboratory
> findings, the individual's own statements about the
> symptoms, any statements and other information
> provided by treating or examining physicians or
> psychologists and other persons about the symptoms and
> how they affect the individual, and any other relevant
> evidence in the case record.

Id. See also 20 C.F.R. § 416.929(c)(4); Meadors v. Astrue, 370
Fed. App'x 179, 183 (2d Cir. 2010).


It should be noted that "the second stage of [the] analysis
may itself involve two parts." Sanchez v. Astrue, 2010 WL
101501, *14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must
decide whether objective evidence, on its own, substantiates the
extent of the alleged symptoms (as opposed to the question in
the first step of whether objective evidence establishes a
condition that could 'reasonably be expected' to produce such
symptoms)." Id. When a plaintiff reports symptoms more severe
than medical evidence alone would suggest, SSA regulations
require the reviewing ALJ to consider additional evidence,
including a specific set of factors, in determining the
credibility of a plaintiff's symptoms and their limiting
effects. SSR 96-7p. See also Sanchez, 2010 WL 101501 at *14; 20
C.F.R. § 416.929(c)(3). These seven factors are:


    (1) The individual's daily activities;

(2) The location, duration, frequency and intensity of pain or other symptoms;
(3) Factors that precipitate and aggravate the symptoms;
(4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
(5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
(6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
(7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; 20 C.F.R. § 416.929(c)(3). If the ALJ does not follow these steps, remand is appropriate. See Sanchez, 2010 WL 101501 at *15.


"[P]laintiff's allegations need not be substantiated by medical evidence, but simply consistent with it. The entire purpose of section [] 416.929 . . . is to provide a means for claimants to offer proof that is not wholly demonstrable by medical evidence." Youney v. Barnhart, 280 F. Supp. 2d 52, 61 n.4 (W.D.N.Y. 2003) "Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions . . ., which can reasonably be accepted as consistent with the objective medical

evidence and other evidence, will be taken into account. . . ."
20 C.F.R. § 416.929(c)(3).


Finally, "[o]nly allegations beyond what is substantiated
by medical evidence are to be subjected to a credibility
analysis. To require plaintiff to fully substantiate her
symptoms with medical evidence would be both in abrogation of
the regulations and against their stated purpose." Hogan v.
Astrue, 491 F. Supp. 2d 347, 353 (W.D.N.Y. 2007)(citing cases).
"[I]f the ALJ decides to reject subjective testimony concerning
pain and other symptoms, he must do so explicitly and with
sufficient specificity to enable the Court to decide whether
there are legitimate reasons for the ALJ's disbelief and whether
his determination is supported by substantial evidence."
Bushansky v. Comm'r of Soc. Sec., 2014 WL 4746092, *7 (S.D.N.Y.
Sept. 24, 2014)(quoting Brandon v. Bowen, 666 F. Supp. 604, 608
(S.D.N.Y. 1987)).


ALJ Heyman determined that the objective evidence alone did
not substantiate the extent of the plaintiff's assertions of
pain symptoms. (Tr. 20). That finding triggered the need to
evaluate Ms. McClinton's credibility in response to her
allegations of pain, and to do so with specific reference to the

seven factors listed in section 416.929(c)(3). <u>Sanchez</u>, 2010 WL 101501 at *14.

However, the ALJ does not appear to have undertaken such a credibility assessment. Indeed, his only reference to credibility was his comment that plaintiff's credibility was diminished by her having tested positive for cocaine in 2008, despite having testified that she was clean of drugs since 2006. (Tr. 21). While this may well be a relevant piece of evidence, the ALJ did not place it, as required, in the context of all the evidence in the record, which included years of treatment notes, several sworn statements by the plaintiff, the testimony of a case worker who observed plaintiff at home over eight months, and the accounts by care providers of plaintiff's contemporaneous reports of pain. Moreover, even in the ALJ's various findings that were clearly based on portions of the medical records, he seemed to rely on plaintiff's accounts of symptoms to her treatment providers when she was feeling better but implicitly rejected her accounts of symptoms when she was feeling worse. (<u>See</u>, <u>e.g.</u>, <u>id.</u> at 19-20 (rejecting her reports of "severe back pain" to Dr. Fernando and the need for pain management in 2011).

The ALJ made references related to each of the required factors enumerated in 20 C.F.R. § 416.929(c), but apparently dismissed them on three grounds: first, that plaintiff "had undergone brief stints of physical therapy although the documented clinical signs were sparse" (Tr. 17); second, that the FEGS team documented her reports of back pain only when walking long distances and at a time when she was not taking medication (id. at 19); and third, that plaintiff "has never been emergently treated for back pain and she has never required surgery." (Id. at 20). The ALJ's apparent reasoning is insufficient for several reasons. The first and third of these apparent justifications do not satisfy the required analysis regarding credibility: they only address the correspondence of objective medical evidence to allegations of pain, rather than the credibility of those allegations of pain that transcend what could be attributed to objective medical evidence. Additionally, the FEGS team's evaluation cannot be controlling in this regard because it was not a treating source, its documentation was prepared in January 2008, before her disability onset date, and its report was prepared without access to plaintiff's medical records. (Id. at 406). Moreover, the ALJ recounted in detail plaintiff's own testimony regarding the limitations that pain imposed on her daily life, the reports of treating physicians documenting the consistency of her complaints regarding the

severity of her pain, and the case worker's testimony, which also confirmed the disabling nature of her pain, but he did not expressly indicate -- aside from the reference to past cocaine use, which was cited explicitly in the context of her mental impairments -- why he did not find this evidence credible. The ALJ has not supported his rejection of plaintiff's credibility explicitly and with the specificity necessary for us to determine whether his determination was supported by substantial evidence. See Bushansky, 2014 WL 4746092 at *7.

On remand, once the Commissioner has assembled a complete record and examined it in full, she should make an explicit credibility assessment regarding plaintiff's subjective allegations of pain.

### D. The Collective Impact of Multiple Maladies Must Be Considered.

The ALJ is required to consider the combined effects of multiple physical maladies and/or psychiatric conditions on the plaintiff's ability to work, regardless of the severity of any of the individual conditions. 20 C.F.R. § 416.923; Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995)("[A]s this court has long recognized, the combined effect of a claimant's impairments must be considered in determining disability; the SSA must

96

evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe.")(citing De Leon v. Secretary of Health & Human Servs., 734 F.2d 930, 937 (2d Cir. 1984); Cutler v. Weinberger, 516 F.2d 1282, 1285 (2d Cir. 1975)). Here the ALJ failed to do so explicitly.

The ALJ's decision addressed plaintiff's back ailment and pains and found that they did not preclude her from light work. He then separately addressed her psychiatric status, which included diagnoses of depression and anxiety. Although he minimized the seriousness of her psychiatric condition, he never addressed the question of whether plaintiff's reported (and presumptively credible) pain would aggravate her psychological difficulties and equally failed to consider the extent (if any) to which her psychiatric problems might aggravate the effect of her back and other pain on her functional capacity for full-time work.

On remand, the Commissioner should make an explicit determination regarding the combined impact of plaintiff's multiple maladies on her residual functional capacity.

**E. The Vocational Evidence Should be Redeveloped.**

An ALJ may rely on the testimony and answers to interrogatories provided by a vocational expert when the hypothetical to which the VE is responding accurately reflects the claimants physical and mental RFC. Owusu v. Astrue, 2009 WL 2476535, *5 (S.D.N.Y. Aug. 13, 2009)(citing Dumas v. Schweiker, 712 F.2d 1545, 1553–54 (2d Cir. 1983)); Henry v. Astrue, 2008 WL 5330523, *11 (S.D.N.Y. Dec. 17, 2008). When a hypothetical question posed to a VE fails to be based upon accurate medical evidence, the VE's responsive opinion cannot constitute substantial evidence in allowing the ALJ to determine what work the claimant can perform. See Rivera v. Colvin, 2014 WL 3732317, *40 (S.D.N.Y. July 28, 2014); Monge v. Astrue, 2014 WL 5025961, *27 (S.D.N.Y. Sept. 29, 2014). And when a remand is already necessary to properly determine the plaintiff's RFC, the vocational-capacity finding must also be remanded when it was based on the testimony of a VE answering a similarly flawed hypothetical. See, e.g., Molina v. Colvin, 2014 WL 3445335, *19 n.21 (S.D.N.Y. July 15, 2014).

The occupational evidence provided by the vocational expert "generally should be consistent with the occupational information supplied by the [Dictionary of Occupational Titles ('DOT'), published by the Department of Labor]." SSR 00-4p. If

there is an "apparent unresolved conflict between [vocational expert] evidence and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the [vocational expert] evidence to support a determination or decision about whether the claimant is disabled." Id.

In his decision, the ALJ found plaintiff to have the RFC to perform light work[79] with additional restrictions, reflective of her mental RFC, to "performing simple and repetitive tasks in a job that requires no more than occasional contact with the public." (Tr. 16). However, in the vocational interrogatory, the answer to which the ALJ applied in his decision, he defined plaintiff's RFC solely by the regulation 20 C.F.R. § 416.967(a), which designates sedentary work,[80] even though his hypothetical

---

[79] Light work is defined by 20 CFR 404.1567(b) and 416.967(b). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567.

[80] 20 CFR §§ 404.1567(a), 416.967(a) define sedentary work. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is

stated "light/sedentary" -- a specification not found in the regulations. (Id. at 343). Adding to this confusion, in response to this hypothetical directing the regulatory exertional capacity for sedentary work, the VE proposed DOT occupational codes that required light work.[81] (See discussion section II.D, supra).

We need not address the possible confusion of the combined evidence from the VE or the mismatch of the ALJ's indication of sedentary exertion with the VE's response of jobs requiring light exertion. Rather, we find that in light of the errors by the ALJ, detailed supra, in arriving at plaintiff's RFC, on remand the Commissioner should reevaluate plaintiff's vocational capacity after she has determined an RFC derived from substantial evidence in the record and informed by the collective impact of plaintiff's multiple maladies to reevaluate plaintiff's vocational capacity.

---

defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567.

[81] 311.677-01, Cafeteria Attendant, features a Strength of "L." 1 Dictionary of Occupational Titles 241. 920.687-018, Bagger, features a Strength of "L." 2 Id. at 936. 323.687-014, Cleaner/Housekeeper, features a Strength of "L." Id. at 248.

**F. Other Issues Raised by Plaintiff are Unavailing.**

In addition to the issues already addressed by the discussion in sections VIII.A-E, _supra_, plaintiff also claimed in her motion papers that the ALJ erred in his evaluation of her obesity and by not acknowledging the treating-source opinions in the record. (Pl. Mem. 10). We find that these assertions are unavailing.

First, obesity, defined by an individual's Body Mass Index ("BMI"),[82] can be a severe impairment on its own or in combination with other impairments. SSR 02-1p. The definitional section introducing _per se_ impairments of the musculoskeletal system requires an ALJ to evaluate the impact of plaintiff's obesity:

---

[82] The National Institutes of Health's Clinical Guidelines establish that a BMI of 30.0-34.9 indicates Level I obesity, while BMIs of 35.0-39.9 indicate Level II obesity. (NIH Publication No. 98-4083, Sept. 1998, referenced in SSR 02-1p). These levels do not correlate with a particular level of functionality. SSR 02-1p.

Definitions of obesity vary: 1. Relative weight compared to a standardized table based on height that exceeds 120% of the ideal value in the table; 2. Calculation of a BMI of 27.5 or greater. BMI is calculated by determining the weight in kilograms and dividing it by the square of the height in meters $(kg/m2)$; and 3. The measure of an individual's waist. "Morbid" or severe obesity is defined as a relative weight over 200%, or a BMI of over 40 $kg/m^2$. Also, elderly patients may mildly exceed calculated levels without being obese. 2 Attorneys Medical Deskbook § 24:29.

> The combined effects of obesity with musculoskeletal
> impairments can be greater than the effects of each of
> the impairments considered separately. Therefore, when
> determining whether an individual with obesity has a
> listing-level impairment or combination of
> impairments, and when assessing a claim at other steps
> of the sequential evaluation process, including when
> assessing an individual's residual functional
> capacity, adjudicators must consider any additional
> and cumulative effects of obesity.

20 C.F.R. § 404 app. 1, 1.00Q.


Here, the ALJ specifically addressed the evidence regarding plaintiff's past diagnoses of obesity and its impact on her physical and mental RFCs, and came to the well-supported conclusion that her obesity "has had little to no impact." (Tr. 18). He grounded this determination in evidence that she was able to carry out her activities of daily living independently, and on her September 2011 testimony demonstrating her significant weight loss in the three months prior to that hearing. (Id.). Unless, upon remand, the Commissioner finds new and material evidence that plaintiff's obesity affects her mental and physical capacities, we see no grounds to disturb the ALJ's findings in this regard.


Plaintiff's final assertion -- that the ALJ did not find treating-source opinions in the record -- is utterly baseless. The ALJ deemed the voluminous records of medical, psychiatric

and psychotherapeutic treatment at North General to be the evidence from her "chief treating source." (Tr. 17). In so far as the ALJ erred by not seeking clarification regarding the many illegible entries in the North General record (see section VIII.A.1, supra), we have already recommended remand to address that matter.

## CONCLUSION

The ALJ failed in several significant ways to fulfill his obligation to evaluate the record and support his findings with substantial evidence. Specifically, he failed to acquire complete evidence regarding her treatment at North General and with Dr. Lee. The ALJ incorrectly applied the treating-physician rule with regard to Dr. Lee. He also failed to properly evaluate Ms. McClinton's credibility and allegations of pain, and the combined impact of her non-severe medical and psychiatric impairments. Finally, his determination at step five is inherently flawed because of its reliance on an RFC derived from these compounded errors.

Accordingly, we conclude that remand is necessary to determine whether, in accordance with SSA regulations and case law, plaintiff qualifies for Supplemental Security Income

benefits. On remand, the Commissioner should develop the record and then reconsider the issues discussed above in light of the totality of the evidence.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Colleen McMahon, Room 1640, 500 Pearl Street, New York, New York, 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

DATED: New York, New York
        September 2, 2015

                            RESPECTFULLY SUBMITTED,


                            _____
                            MICHAEL H. DOLINGER
                            UNITED STATES MAGISTRATE JUDGE




        Copies of the foregoing Report and Recommendation have been
sent this date to:

        Joanne Pengelly, Esq.
        Social Security Administration, OGC
        26 Federal Plaza, Room 3904
        New York, NY 10278

        Max D. Leifer, Esq.
        214 Sullivan Street – Suite 3-C
        New York, New York 10012